# Exhibit 1

## DISTRIBUTION AGREEMENT

This Distribution Agreement (this "Agreement") is effective as of April __, 2021 (the "**Effective Date**"), by and between **AQUIS HAIRSCIENCES INC**, a California corporation, having its principal place of business at 621 Sansome Street, San Francisco, California 94111, USA ("**K18 BIOMIMETIC HAIRSCIENCE**"), and **SAS CSP LOGISTICS**, a COMPANY organized under the laws of FRANCE and having its principal place of business at GALLARGUES LE MONTUEUX (30660) in France (**"Distributor"**).

## RECITALS

**WHEREAS,** K18 BIOMIMETIC HAIRSCIENCE is in the business of creating, manufacturing, marketing, selling, and distributing K18 BIOMIMETIC HAIRSCIENCE Products (as defined below) on a worldwide basis;

**WHEREAS**, K18 BIOMIMETIC HAIRSCIENCE, individually or through its affiliates, owns the K18 BIOMIMETIC HAIRSCIENCE trademarks set forth on Exhibit A attached hereto (the "**K18 BIOMIMETIC HAIRSCIENCE Trademarks**") and has the exclusive global rights to the K18 BIOMIMETIC HAIRSCIENCE Trademarks and K18 BIOMIMETIC HAIRSCIENCE IP (as defined below); and

**WHEREAS**, K18 BIOMIMETIC HAIRSCIENCE wishes to grant Distributor exclusive certain rights to import, market, advertise, warehouse, and sell K18 BIOMIMETIC HAIRSCIENCE Products in the Territory (as defined below), and Distributor wishes to accept those rights in accordance with the terms of this Agreement.

In consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, K18 BIOMIMETIC HAIRSCIENCE and Distributor respectively agree as follows.

1. **INTRODUCTION**

   1.1. **Definitions.**

   Any initially capitalized terms not otherwise defined herein shall have the meanings given to such terms in Exhibit B attached hereto. Where the context requires, such definitions shall include the plural as well as the singular.

   1.2. **K18 BIOMIMETIC HAIRSCIENCE Products.**

   K18 BIOMIMETIC HAIRSCIENCE markets and sells a line of high-quality hair care products as described on Exhibit C attached hereto (the "**K18 BIOMIMETIC HAIRSCIENCE Products**" or sometimes "Products") under the K18 BIOMIMETIC HAIRSCIENCE Trademarks through distributors, wholesale partners, and online (e.g., www.k18HAIR.com).

   1.3. **Distributor's Acknowledgements.**

   Distributor acknowledges K18 BIOMIMETIC HAIRSCIENCE Products have achieved a prestigious image, and the K18 BIOMIMETIC HAIRSCIENCE Trademarks are famous throughout the world. Distributor has read and understands the terms of this Agreement and accepts them as being reasonably necessary to protect the goodwill associated with the K18 BIOMIMETIC HAIRSCIENCE IP. Distributor has conducted an independent investigation of the business contemplated by this Agreement, and Distributor has received all information requested and/or necessary to make an informed decision to proceed with this Agreement. Distributor has not received or relied on any guaranty or assurance, express or implied, as to the revenues, goodwill, profits or success of the transactions to be conducted pursuant to this Agreement.

   1.4. **Representations and Warranties.**

   Distributor and K18 MIOMIMETIC HAIRSCIENCE each represents and warrants to one another that: (a) it has not knowingly made any untrue statements of material fact nor has omitted to state any material fact in obtaining the rights granted hereunder; (b) the execution and performance of this Agreement will not violate any other agreement to which it or any of its Affiliates may be bound; (c) it will comply with all applicable laws,

1

regulations, orders, and other requirements of any governmental authority in its performance of this Agreement; and (d) it has the full right and authority to perform its obligations hereunder.

## 2. GRANT OF RIGHTS

### 2.1. Distribution Rights.

2.1.1. Authorization.  During the Term, and provided Distributor is in compliance with this Agreement (including, but not limited to, fulfilling Distributor's obligations under Section 4), K18 BIOMIMETIC HAIRSCIENCE hereby authorizes Distributor to import, market, promote, sell and distribute K18 BIOMIMETIC HAIRSCIENCE Products on an exclusive basis to PBIOs and Retail in the Territory, in each case subject to the terms and conditions of this Agreement.  No direct or indirect fee is payable by Distributor for the rights granted hereunder and no franchise relationship is intended to be created by this Agreement. "Retail" shall mean retail stores offering personal care and beauty products and may include third-party retailers as well as franchise and company owned locations of Distributor, and shall further include Distributor's online store at bleulibellule.com offering personal care and beauty products.

2.1.2. New Product Lines.  Any new products or product lines developed by K18 BIOMIMETIC HAIRSCIENCE ("New Product Lines") shall be offered to Distributor. Any New Product Lines which K18 BIOMIMETIC HAIRSCIENCE decides to offer to Distributor, may be sold by Distributor at its discretion and will thereafter be included within the definition of "K18 BIOMIMETIC HAIRSCIENCE Products" set forth above, as well as the Product Purchase Requirements set forth in Section 8.  At all times during the Term, Distributor shall diligently stock, sell, market, and distribute a full range of K18 BIOMIMETIC HAIRSCIENCE Products as required by Section 5.1.9 below.

2.1.3. License.  This Agreement gives Distributor no rights in the K18 BIOMIMETIC HAIRSCIENCE IP except that K18 BIOMIMETIC HAIRSCIENCE grants Distributor a limited, nonexclusive (except to the extent set forth herein), nontransferable, revocable, non-royalty-bearing license to reproduce the K18 BIOMIMETIC HAIRSCIENCE Trademarks solely during the Term and in strict accordance herewith (including, without limitation, the provisions relating to the review by K18 BIOMIMETIC HAIRSCIENCE of Distributor's advertisements and other promotional materials) and with the reasonable standards required by K18 BIOMIMETIC HAIRSCIENCE for the protection of the K18 BIOMIMETIC HAIRSCIENCE Trademarks.  Such license is granted solely for the purpose of assisting Distributor in promoting the sale to and use of the K18 BIOMIMETIC HAIRSCIENCE Products by customers under this Agreement.  Distributor shall not, directly or indirectly, under any circumstances, copy, replicate or "reverse engineer" the K18 BIOMIMETIC HAIRSCIENCE Products or any other products designed, manufactured, compiled, assembled, interpreted, processed, or packaged by K18 BIOMIMETIC HAIRSCIENCE.

2.1.4. Reservation of Rights.  No other rights are granted hereunder to Distributor.  All rights of K18 BIOMIMETIC HAIRSCIENCE not herein granted are expressly reserved by K18 BIOMIMETIC HAIRSCIENCE.  K18 BIOMIMETIC HAIRSCIENCE retains all of its rights and discretion with respect to the K18 BIOMIMETIC HAIRSCIENCE Trademarks, K18 BIOMIMETIC HAIRSCIENCE IP, K18 BIOMIMETIC HAIRSCIENCE Products, and New Product Lines throughout the world (except to the extent granted hereunder), and the right to engage in any business whatsoever on such terms and conditions as K18 BIOMIMETIC HAIRSCIENCE deems appropriate.

### 2.2. Authorized Product Sales.

2.2.1. Sales to PBIOs and Retail.  Distributor shall have the exclusive right to distribute and sell K18 BIOMIMETIC HAIRSCIENCE Products in the Territory to only PBIOs and Retail.

### 2.3. Diversion

2.3.1. Diversion of K18 BIOMIMETIC HAIRSCIENCE Products. Distributor acknowledges and agrees that the Diversion of K18 BIOMIMETIC HAIRSCIENCE Products to unauthorized outlets or channels of distribution will damage the image and public perception of K18 BIOMIMETIC HAIRSCIENCE

Products and harm sales to PBIOs.  Under no circumstances shall Distributor distribute, participate in a scheme to sell, and/or sell any K18 BIOMIMETIC HAIRSCIENCE Products in or to any location or establishment other than bona fide PBIOs in the Territory.  In the event that Distributor becomes aware that a bona fide PBIO is engaging in Diversion, Distributor shall immediately cease selling K18 BIOMIMETIC HAIRSCIENCE Products to that PBIO.  If K18 BIOMIMETIC HAIRSCIENCE becomes aware that any customer to which Distributor has sold K18 BIOMIMETIC HAIRSCIENCE Products is engaged in Diversion, K18 BIOMIMETIC HAIRSCIENCE shall provide notice of the same to Distributor and so long as Distributor shall terminate sales to such customer within fifteen (15) days of such notice Distributor shall not be deemed to be engaged in, or participating with such Diversion, nor in breach or default hereunder as a result of such Diversion by said customer.  Distributor is strictly prohibited from the Diversion of K18 BIOMIMETIC HAIRSCIENCE Products by any method.

2.3.2. No Sales to Diverters.  Distributor shall not directly or indirectly sell any K18 BIOMIMETIC HAIRSCIENCE Products to any person or entity that is known to Distributor to engage directly or indirectly in any form of Diversion.

2.3.3. Monitoring Sales of K18 BIOMIMETIC HAIRSCIENCE Products.  Distributor shall monitor its sales of the K18 BIOMIMETIC HAIRSCIENCE Products and investigate promptly and report to K18 BIOMIMETIC HAIRSCIENCE any suspected instances involving the Diversion of any K18 BIOMIMETIC HAIRSCIENCE Products, or any unusual buying practices involving any K18 BIOMIMETIC HAIRSCIENCE Products by a customer of Distributor that Distributor should reasonably conclude indicates the existence of diversion.  Distributor shall use best efforts to cooperate with K18 BIOMIMETIC HAIRSCIENCE in any legal proceeding or investigations against any third party, which K18 BIOMIMETIC HAIRSCIENCE may institute concerning Diversion.

2.3.4. Anti-Diversion Agreement.  Distributor acknowledges that K18 BIOMIMETIC HAIRSCIENCE may request Distributor sign a separate Anti-Diversion Agreement.  While the Anti-Diversion Agreement and this Agreement are meant to complement each other, in the event there is a dispute between the Anti-Diversion Agreement and this Agreement, with respect to Diversion only (as provided for in this Section 2.3), the Anti-Diversion Agreement supersedes this Agreement.

**2.4. Territory.**

2.4.1. In Territory Sales.  The distribution rights granted herein extend only to PBIOs in the Territory listed on Exhibit D attached hereto.  Distributor is prohibited from promoting, marketing or selling K18 BIOMIMETIC HAIRSCIENCE Products, directly or indirectly, through the Internet or other means or to PBIOs outside of the Territory except in instances in which K18 BIOMIMETIC HAIRSCIENCE authorizes such sales in advance in writing.  This includes chains of PBIOs that may overlap territories, meaning that Distributor is only permitted to sell to those stores which are part of a PBIO chain if such stores are physically located in Territory and it may not sell any K18 BIOMIMETIC HAIRSCIENCE Products to other stores in such PBIO chain nor to any affiliate of such chain if Distributor knows or has reason to believe that any K18 BIOMIMETIC HAIRSCIENCE Products will ultimately reach or be sold or be offered for sale in a store outside of the Territory.

2.4.2. No Sales to PBIOs outside the Territory.  Distributor shall not advertise, promote, market or solicit PBIOs for K18 BIOMIMETIC HAIRSCIENCE Products outside the Territory nor establish any office through which orders are solicited or any depot at which inventories are stored outside the Territory.

**2.5. Sub-Distributors.**

Distributor may appoint and authorize sub-distributors to market, distribute and sell K18 BIOMIMETIC HAIRSCIENCE Products within the Territory subject to the terms and conditions of this Agreement, provided that at least ten (10) days prior to the appointment of any such sub-distributor, Distributor shall notify K18 BIOMIMETIC HAIRSCIENCE of the identity, address and market of such sub-distributor and K18 BIOMIMETIC HAIRSCIENCE must approve the appointment of the sub-distributor in writing.  Distributor shall not sell or otherwise transfer K18 BIOMIMETIC HAIRSCIENCE Products to any sub-distributor until such sub-distributor enters into a form of written agreement, which must be approved by K18 BIOMIMETIC HAIRSCIENCE in advance in writing, (the "**Sub-Distributor Agreement**") with

Distributor, which shall include provisions to bind such sub-distributor to, among other things, the terms and conditions relating to the product and territorial scope and other limitations set forth in this Agreement, and authorize K18 BIOMIMETIC HAIRSCIENCE to enforce the provisions of the Sub-Distributor Agreement. Upon execution, a copy of the Sub-Distributor Agreement shall be provided to K18 BIOMIMETIC HAIRSCIENCE via electronic mail or physical hardcopy to the address provided in Section 19.3. Distributor agrees that any breach by the sub-distributor under the Sub-Distributor Agreement shall constitute a breach by Distributor of this Agreement, unless, within thirty (30) days from the date when K18 BIOMIMETIC HAIRSCIENCE or Distributor gives notice of such breach to the sub-distributor, either (a) such breach is cured to K18 BIOMIMETIC HAIRSCIENCE's reasonable satisfaction or (b) the Sub-Distributor Agreement has been terminated.

**2.6. Inspection.**

In order to ensure Distributor's compliance with the terms of this Agreement, Distributor hereby agrees that K18 BIOMIMETIC HAIRSCIENCE shall have the right, upon advanced notice to Distributor of fifteen (15) business days, at K18 BIOMIMETIC HAIRSCIENCE's expense, to inspect, at reasonable times, either itself or through its duly authorized representatives, all or any portion of Distributor's facilities and its relevant books and records with regard solely to (i) the use of K18 Confidential Information (as hereinafter defined) and K18 BIOMIMETIC HAIRSCIENCE Trademarks, (ii) sales of K18 BIOMIMETIC HAIRSCIENCE Products to assure sales comply with this Agreement, including without limitation, sales only to PBIOs in the Territory as listed on Exhibit D attached hereto and other sales permitted by the terms hereof; (iii) the storage marketing, sale, and distribution of the K18 BIOMIMETIC HAIRSCIENCE Products, and (iv) Distributor's compliance with this Agreement. In connection with the foregoing, Distributor shall be entitled to limit access of K18 BIOMIMETIC HAIRSCIENCE to certain areas of its facilities so as to prevent K18 BIOMIMETIC HAIRSCIENCE from having access to Distributor Confidential Information (as hereinafter defined) and may redact books and records as it deems necessary to protect Distributor Confidential Information (including, without limitation, redacting or not providing names and addresses of Distributor's customers) so long as the purpose of such inspection is not frustrated.

**3. TERM**

**3.1. Term.**

This Agreement shall become effective and commence on the Effective Date and shall continue for a period of five (5) years from the Effective Date, subject to earlier termination as provided in this Agreement (the **"Initial Term"**).

**3.2. Extension of Term.**

Subject to the conditions contained in this Section 3.2.1 – 3.2.3, the Term shall automatically be extended one (1) additional term of two (2) years, subject to earlier termination as provided in this Agreement (the **"Extension Term"** and collectively with the Initial Term, the **"Term"**) if:

3.2.1. Distributor is in full compliance with this Agreement;

3.2.2. There is no applicable law which has been enacted, promulgated, or amended after the Effective Date, which may have a material adverse effect on K18 BIOMIMETIC HAIRSCIENCE's rights, remedies, or discretion under this Agreement; and

3.2.3. No later than one hundred eighty (180) days prior to the expiration of the Initial Term, neither party has provided the other with its written notice that the Term shall be limited to the Initial Term and that there shall be no Extension Term.

3.2.4. As a condition to the commencement of the Extension Term, no later than ninety (90) days prior to the expiration of the Initial Term, BIOMIMETIC HAIRSCIENCE and Distributor shall agree upon a new, written projected sales schedule and business plan for the Extension Term.

**4. DUTIES AND OBLIGATIONS OF K18 BIOMIMETIC HAIRSCIENCE**

**4.1. Product Supply.**

K18 BIOMIMETIC HAIRSCIENCE shall supply Distributor with K18 BIOMIMETIC HAIRSCIENCE Products in sufficient quantity to meet Distributor's needs within the Territory to achieve and encourage maximum market penetration, except to the extent K18 BIOMIMETIC HAIRSCIENCE is prevented from doing so by a Force Majeure. Notwithstanding anything to the contrary contained herein, K18 BIOMIMETIC HAIRSCIENCE reserves the right to allocate its K18 BIOMIMETIC HAIRSCIENCE Products as K18 BIOMIMETIC HAIRSCIENCE (in its sole discretion) shall determine appropriate. K18 BIOMIMETIC HAIRSCIENCE shall not be liable for any delay or failure in manufacture, delivery, or shipment caused by a Force Majeure, provided that any such delay or failure to deliver shipments shall not result in Distributor's failure, or a claim that Distributor has failed, to satisfy the Minimum Product Purchase Requirements.

**4.2. Changes to Product.**

K18 BIOMIMETIC HAIRSCIENCE reserves the right to make whatever changes or modifications it deems necessary or advisable in products, packaging, labeling, promotional, display, or other advertising materials. K18 BIOMIMETIC HAIRSCIENCE will endeavor to provide Distributor with reasonable prior written notice before such changes go into effect.

## 5. DUTIES AND OBLIGATIONS OF DISTRIBUTOR

**5.1. Duties and Obligations.**

In addition to complying with its other obligations under this Agreement, Distributor shall perform the following services:

5.1.1. Operate an adequate place of business, including warehouse or warehouses within the Territory, which may be a third-party bonded warehouse facility with which Distributor enters into a contract for warehouse and fulfillment services;

5.1.2. Develop the Territory as a market for the K18 BIOMIMETIC HAIRSCIENCE Products to the reasonable satisfaction of K18 BIOMIMETIC HAIRSCIENCE;

5.1.3. Ensure that K18 BIOMIMETIC HAIRSCIENCE receives no less favorable terms, focus, and incentives, including, but not limited to, salesman commissions or other selling incentives, than any other brand Distributor represents;

5.1.4. Intentionally left blank;

5.1.5. Promptly respond to all inquiries from customers, including complaints, and promptly process all orders and effect all shipments of K18 BIOMIMETIC HAIRSCIENCE Products;

5.1.6. Diligently investigate all leads with respect to potential customers referred to it;

5.1.7. Keep K18 BIOMIMETIC HAIRSCIENCE fully informed of all inquiries and orders received by Distributor from any person or parties located outside the Territory;

5.1.8. Use commercially reasonable efforts to promote and sell K18 BIOMIMETIC HAIRSCIENCE Products to PBIOs within the Territory and to achieve maximum market penetration therein;

5.1.9. At all times maintain an adequate and representative inventory of each K18 BIOMIMETIC HAIRSCIENCE Product including any additional product lines offered to Distributor by K18 BIOMIMETIC HAIRSCIENCE, which Distributor accepts to distribute pursuant to this Agreement; and

5.1.10. Notify K18 BIOMIMETIC HAIRSCIENCE promptly of any unfair competition, diversion, transshipment, redistribution or other unauthorized sales of K18 BIOMIMETIC HAIRSCIENCE products, by Distributor, its employees, or any third-party which comes to Distributor's attention.

**5.2. Support Services.**

Distributor shall provide any and all necessary and appropriate Support Services to PBIOs in the Territory and shall at all times maintain a sufficient staff of resident personnel fully trained, experienced and qualified to perform such Support Services.

**5.3.  Sales of Customers**.

It is the corporate policy of K18 BIOMIMETIC HAIRSCIENCE and its employees, agents, representatives, contractors, distributors and sub-distributors to promote, market and distribute K18 BIOMIMETIC HAIRSCIENCE Products in an efficient and courteous manner, regardless of customers' gender, race, religion, ethnic origin, linguistic origin or sexual preference or orientation and Distributor shall adhere to such policy.

**5.4.  Maintenance of Books and Records.**

5.4.1.  Distributor shall maintain and preserve, during the Term and for at least three (3) years after termination of this Agreement, full, complete and accurate records, including all electronic records of any kind, relating to its marketing and sale of K18 BIOMIMETIC HAIRSCIENCE Products.

5.4.2.  Distributor shall provide to K18 BIOMIMETIC HAIRSCIENCE such other and additional reports and information relating to the purposes and intent of this Agreement as K18 BIOMIMETIC HAIRSCIENCE may reasonably request from time to time, subject to Distributor's right to redact or exclude customer identities and other Distributor Confidential Information.  Distributor shall provide the following to K18 BIOMIMETIC HAIRSCIENCE:

  a)  A schedule of total sales to PBIOs in the Territory (without identifying any particular PBIO) as of the last day of a month or other time period specified by K18 BIOMIMETIC HAIRSCIENCE);

  b)  A complete schedule of Distributor inventory of all such K18 BIOMIMETIC HAIRSCIENCE Products as of the last day of each month (or such other time period as specified by K18 BIOMIMETIC HAIRSCIENCE);

  c)  Monthly reports of cumulative dollar sales by sales unit (salesmen sales vs. company stores) online sales and new doors opened (both number and dollar amount of sales);

**6.  ADVERTISING AND PROMOTIONS**

**6.1.  Advertising and Marketing Materials produced by K18 BIOMIMETIC HAIRSCIENCE.**

K18 BIOMIMETIC HAIRSCIENCE may, in its discretion, provide Distributor with copies (in electronic form or through other media) of advertising and marketing materials that K18 BIOMIMETIC HAIRSCIENCE deems appropriate for use in the Territory.  K18 BIOMIMETIC HAIRSCIENCE shall have no responsibility for translating such material into the language principally used in the Territory and Distributor shall be solely responsible for such translation. All costs and expenses incurred by Distributor with respect to (a) translating advertising and marketing materials provided by K18 BIOMIMETIC HAIRSCIENCE, (b) creating its own advertising and promotional materials, and (c) advertising and promoting the K18 BIOMIMETIC HAIRSCIENCE Products shall be borne by the Distributor.

**6.2.  Distributor's Advertising and Promotional Materials.**

Distributor agrees that all advertising and promotional materials it creates or uses for K18 BIOMIMETIC HAIRSCIENCE shall be in good taste and project K18 BIOMIMETIC HAIRSCIENCE as a premium high-end product. K18 BIOMIMETIC HAIRSCIENCE retains the right to approve and/or modify all advertising and promotional materials used by Distributor in conjunction with K18 BIOMIMETIC HAIRSCIENCE Products, and Distributor shall provide K18 BIOMIMETIC HAIRSCIENCE with such materials upon its request from time to time.  All costs for marketing, advertising, and sale, including media space, print and production, point of sale materials, transparencies, in-salon display materials, feature area presentations, booth materials, windows displays and collateral materials, and all other related costs will be borne by Distributor. Notwithstanding the foregoing, K18 BIOMIMETIC HAIRSCIENCE shall give Distributor a ten percent (10%) discount off of standard distributor pricing, such discounted amount to be used by Distributor for marketing, advertising and promotional efforts pursuant to this Section 6. All initiatives and events in the Territory shall also be paid by Distributor or as otherwise agreed to in advance of any event.

**6.3.  Market Research.**

Distributor shall provide K18 BIOMIMETIC HAIRSCIENCE with copies of market research and consumer services in the Territory that Distributor possesses and as K18 BIOMIMETIC HAIRSCIENCE may reasonably request, including aided and unaided brand awareness, without their being any obligation of Distributor to conduct such research or services.

### 6.4. Marketing and Sale on the Internet.

Distributor covenants that it has not (except as otherwise disclosed to K18 BIOMIMETIC HAIRSCIENCE in writing), and shall not, acquire, register, or hold any domain name, home page, social media account, handle, username, or other online name or account associated with K18 BIOMIMETIC HAIRSCIENCE, or other related names or addresses (each, a "**K18 BIOMIMETIC HAIRSCIENCE Online Account**"). In the event that Distributor inadvertently, or after a request from K18 BIOMIMETIC HAIRSCIENCE, does register, apply for, or otherwise acquire a K18 BIOMIMETIC HAIRSCIENCE Online Account, such account shall be immediately turned over and assigned to K18 BIOMIMETIC HAIRSCIENCE, at no charge. This Section 6.4 shall in no way limit Distributor from using social media accounts or the social media accounts described in Section 6.5 to promote K18 BIOMIMETIC HAIRSCIENCE Products. Additionally, in the event of termination of this Agreement, K18 BIOMIMETIC HAIRSCIENCE acknowledges that Customer data and information acquired through Distributor's web sites or social media, as well as the web sites or social media pages on which such data and information resides, shall belong to Distributor; provided, however, that all K18 BIOMIMETIC HAIRSCIENCE Trademarks and/or K18 BIOMIMETIC HAIRSCIENCE IP shall remain solely owned by K18 BIOMIMETIC HAIRSCIENCE.

### 6.5. Developing Social Media Presence and Following.

Distributor will use its best efforts to create, cultivate, and grow an online K18 BIOMIMETIC HAIRSCIENCE community using social media and the social media accounts to which Distributor is provided access by K18 BIOMIMETIC HAIRSCIENCE. Distributor shall appoint an individual, or group of individuals, to serve in the role as social media/brand manager(s) who would be responsible for developing K18 BIOMIMETIC HAIRSCIENCE's social media presence online. That individual's contract information shall be shared with K18 BIOMIMETIC HAIRSCIENCE in order to more efficiently partner on social media programs.

## 7. ORDERS FOR PRODUCTS

### 7.1. Purchase Orders.

Distributor shall submit purchase orders for K18 BIOMIMETIC HAIRSCIENCE Products to K18 BIOMIMETIC HAIRSCIENCE in writing, by email using the form attached to this contract as Exhibit E or using such other form as may be agreed to by the parties. Requested delivery dates and shipping instructions should be included on the order form. Each order placed by Distributor shall be subject to acceptance by K18 BIOMIMETIC HAIRSCIENCE and shall be deemed to incorporate the terms and conditions of this Agreement.

### 7.2. Modification of Orders.

No accepted purchase order shall be modified, changed or cancelled by Distributor without K18 BIOMIMETIC HAIRSCIENCE's written approval. Modified or changed orders shall be subject to all of the provisions of this Agreement, whether or not the change order so states.

### 7.3. Delivery Terms.

All K18 BIOMIMETIC HAIRSCIENCE purchase orders submitted by Distributor shall be EXWORKS K18 BIOMIMETIC HAIRSCIENCE U.S. Warehouse with Distributor responsible for freight charges. K18 BIOMIMETIC HAIRSCIENCE reserves the right to reasonably change or modify its U.S. warehouse location upon reasonable notice to Distributor.

8. **PRODUCT PURCHASE REQUIREMENTS**

### 8.1. Product Purchase Requirements

Distributor agrees that, during the Term, it shall purchase from K18 BIOMIMETIC HAIRSCIENCE not less than the amounts of the K18 BIOMIMETIC HAIRSCIENCE Products set forth on Exhibit F attached hereto (the "**Minimum Product Purchase Requirements**").

### 8.2. Quarterly Product Purchase Requirements

Distributor agrees that during each calendar year (or partial year) that this Agreement is in effect, Distributor shall purchase no less than Distributor's Minimum Product Purchase Requirements for that year as set for in Section 8.1 above. After the first year that this Agreement is in effect, the parties shall enter into good-faith discussions to come to mutual agreement as to the percentage for the subsequent year.

### 8.3. Failure to Meet Minimum Product Purchase Requirements

Distributor agrees that the Minimum Product Purchase Requirements provided herein are fair and reasonable for the Territory. If Distributor fails to meet these Minimum Product Purchase Requirements or Sell–Through Requirements in any four (4) consecutive calendar quarters, except as a result of K18 BIOMIMETIC HAIRSCIENCE's inability or failure to timely fill purchase orders, or the presence of an event or condition of Force Majeure, K18 BIOMIMETIC HAIRSCIENCE may at its option, either (a) do nothing or (b) immediately terminate this Agreement without further obligation to the Distributor, except as otherwise set forth herein. Should K18 BIOMIMETIC HAIRSCIENCE elect to choose (a) in the preceding sentence, then all other rights and obligations under this Agreement remain in full force and effect for the duration of the Term. For the avoidance of doubt, Distributor shall not be deemed to be in default of any provision of this Section 8 resulting from (i) any Force Majeure, (ii) any failure of K18 BIOMIMETIC HAIRSCIENCE to timely fulfill Distributor's purchase orders or (iii) any issue with Products (including without limitation recalls, consumer complaints, government inquiries or suspension of manufacturing or distribution) outside the control of Distributor.

9. **PRICES AND PAYMENTS**

### 9.1. Prices.

The initial prices to be paid by Distributor for K18 BIOMIMETIC HAIRSCIENCE Products purchased pursuant to this Agreement shall be the prices set forth on Exhibit F attached hereto. Such prices may be adjusted from time to time by K18 BIOMIMETIC HAIRSCIENCE in its discretion upon at least ninety (90) days' prior written notice to Distributor and shall be applicable to all purchase orders received by K18 BIOMIMETIC HAIRSCIENCE from Distributor after such date.

### 9.2. Payment Required.

For all purchase orders for K18 BIOMIMETIC HAIRSCIENCE Products submitted to K18 BIOMIMETIC HAIRSCIENCE hereunder, the payment terms shall be as follows: (a) Within thirty (30) days of delivery of K18 BIOMIMETIC HAIRSCIENCE Products to K18 BIOMIMETIC HAIRSCIENCE's U.S. warehouse pursuant to Section 7.3 above, Distributor shall pay all amounts due to K18 BIOMIMETIC HAIRSCIENCE; (b) all payments to be made by Distributor to K18 BIOMIMETIC HAIRSCIENCE hereunder shall be paid by direct bank transfer from a bank approved in advance by K18 BIOMIMETIC HAIRSCIENCE and without any offset for any costs or deductions including, without limitation, (i) all taxes, (ii) license and registration fees, and (iii) bank charges and processing fees, all of which shall be the sole responsibility of and borne by Distributor. Unless otherwise agreed to in writing by K18 BIOMIMETIC HAIRSCIENCE, all prices for the K18 BIOMIMETIC HAIRSCIENCE Products and any other amounts due and owing under this Agreement are quoted, due and payable in United States Dollars and all references to "$" or "Dollars" in this Agreement shall refer to United States Dollars.

### 9.3. Interest on Late Payments.

All amounts which Distributor owes K18 BIOMIMETIC HAIRSCIENCE for the purchase of K18 BIOMIMETIC HAIRSCIENCE Products, and for any other amounts due under this Agreement shall, unless subject to reasonable dispute, bear interest after their due date at the highest contract rate of interest permitted by law, not to exceed one and one-half percent (1.5%) per month calculated on a daily basis; provided, however,

Distributor's failure to pay a properly invoiced amount when due more than twice in any calendar quarter constitutes grounds for termination of this Agreement, as provided in Sections 9.6 and 15.

### 9.4. Exchange Rate Controls.

If at any time legal restrictions shall be imposed upon the purchase of U.S. Dollars or the transfer to or credit of a non-resident corporation with payments in U.S. Dollars, Distributor shall notify K18 BIOMIMETIC HAIRSCIENCE immediately. Distributor shall obtain any consents or authorizations which may be necessary in order to permit timely payments in U.S. Dollars of all amounts payable hereunder. While such restrictions are in effect, K18 BIOMIMETIC HAIRSCIENCE may require Distributor to deposit all amounts due but unpaid as a result of such a restriction in any type of account, in any bank or institution in the Territory designated by K18 BIOMIMETIC HAIRSCIENCE and in any currency designated by K18 BIOMIMETIC HAIRSCIENCE that is available to Distributor. K18 BIOMIMETIC HAIRSCIENCE shall be entitled to all interest earned on such deposits. K18 BIOMIMETIC HAIRSCIENCE shall bear all risk of loss with respect to the deposited funds and interest payable thereon once such funds have been properly deposited in the designated account by Distributor. In the event such restrictions are in place for ninety (90) days or longer, K18 BIOMIMETIC HAIRSCIENCE shall have the right, but not the obligation, to terminate this Agreement upon notice to Distributor.

### 9.5. Value Added Taxes.

If any amounts payable to K18 BIOMIMETIC HAIRSCIENCE hereunder are subject to any value added taxes in the Territory, Distributor shall pay such tax in respect of such amounts at the same time as such amounts are paid to K18 BIOMIMETIC HAIRSCIENCE.

### 9.6. Failure to Pay.

Distributor's failure to pay in full a properly invoiced amount when due to K18 BIOMIMETIC HAIRSCIENCE more than twice in any calendar quarter, shall constitute a breach of this Agreement and, in addition to whatever other remedies may be available to K18 BIOMIMETIC HAIRSCIENCE, including the termination of this Agreement, shall give K18 BIOMIMETIC HAIRSCIENCE the right to suspend further shipments to Distributor until the default has been cured, to make further shipments only after all previous orders have been paid in full, or to make further shipments on whatever terms K18 BIOMIMETIC HAIRSCIENCE deems advisable.

## 10. ACCEPTANCE AND WARRANTY; LIMITATION OF LIABILITY.

### 10.1.    Acceptance of Products.

Distributor may test K18 BIOMIMETIC HAIRSCIENCE Products upon receipt thereof. If Distributor has failed to provide K18 BIOMIMETIC HAIRSCIENCE with notice of any nonconforming shipment or has otherwise failed to reject all or any portion of the shipment within ten (10) calendar days from the date of receipt, all K18 BIOMIMETIC HAIRSCIENCE Products contained in such shipment shall be deemed accepted by Distributor. In the event of any shortage, damage or discrepancy in or to a shipment of K18 BIOMIMETIC HAIRSCIENCE Products, Distributor shall promptly report it to K18 BIOMIMETIC HAIRSCIENCE and shall provide K18 BIOMIMETIC HAIRSCIENCE with such substantiating evidence, as it deems appropriate. If the substantiating evidence delivered by Distributor demonstrates to K18 BIOMIMETIC HAIRSCIENCE that such shortage, damage or discrepancy existed at the time of delivery of the K18 BIOMIMETIC HAIRSCIENCE Products, and K18 BIOMIMETIC HAIRSCIENCE shall promptly deliver additional products or a credit to the Distributor. In no event shall K18 BIOMIMETIC HAIRSCIENCE be liable for any additional costs, expenses or damages incurred by Distributor directly or indirectly as a result of such shortage, damage or discrepancy.

### 10.2.    Product Warranties.

K18 BIOMIMETIC HAIRSCIENCE warrants to Distributor that the K18 BIOMIMETIC HAIRSCIENCE Products it supplies to Distributor hereunder shall be free from defects in materials and workmanship and shall be fit for their intended purpose when stored and used in accordance with K18 BIOMIMETIC HAIRSCIENCE instructions, precautions, and standard procedures.

### 10.3.    Limited Warranty

THE WARRANTIES SET FORTH IN SUBSECTION 10.2 ARE INTENDED SOLELY FOR THE BENEFIT OF DISTRIBUTOR AND CLAIMS HEREUNDER SHALL BE MADE BY DISTRIBUTOR AND CANNOT

BE MADE BY DISTRIBUTOR'S CUSTOMERS. THE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED, WHICH ARE HEREBY DISCLAIMED AND EXCLUDED BY K18 BIOMIMETIC HAIRSCIENCE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE AND ALL OBLIGATIONS OR LIABILITIES ON THE PART OF K18 BIOMIMETIC HAIRSCIENCE FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE PRODUCTS. NOTWITHSTANDING THE FOREGOING, K18 BIOMIMETIC HAIRSCIENCE SHALL INDEMNIFY, DEFEND AND HOLD DISTRIBUTOR HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS MADE BY CUSTOMERS OF DISTRIBUTOR AND/OR USERS OF PRODUCTS UNLESS THE PRODUCT HAS BEEN ALTERED BY DISTRIBUTOR.

**10.4.**    **Excluded Claims**.

K18 BIOMIMETIC HAIRSCIENCE shall have no obligations under any warranty set forth above in the event that:

a) The K18 BIOMIMETIC HAIRSCIENCE Products have been modified in any manner without prior written consent of K18 BIOMIMETIC HAIRSCIENCE; or

b) The K18 BIOMIMETIC HAIRSCIENCE Products have not been stored or used in accordance with K18 BIOMIMETIC HAIRSCIENCE's instructions, precautions and standard procedures, by Distributor or any of its customers.

**10.5.**    **Limitation of Liability.**

EXCEPT FOR THE INDEMNIFICATION OBLIGATION OF K18 BIOMIMETIC HAIRSCIENCE SET FORTH IN SECTION 10.3 WHICH IS SPECIFICALLY CARVED OUT OF THIS SECTION 10.5, IN NO EVENT IS K18 BIOMIMETIC HAIRSCIENCE, DISTRIBUTOR OR EITHER OF THEIR REPRESENTATIVES LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES, OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF: (A) WHETHER THE DAMAGES WERE FORESEEABLE; (B) WHETHER OR NOT K18 BIOMIMETIC HAIRSCIENCE OR DISTRIBUTOR WAS ADVISED OF THE POSSIBILITY OF THE DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) ON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE. IN NO EVENT SHALL K18 BIOMIMETIC HAIRSCIENCE'S OR DISTRIBUTOR'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID TO K18 BIOMIMETIC HAIRSCIENCE UNDER THIS AGREEMENT IN THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

**11. INSURANCE**

**11.1.**    **Distributor's Insurance**

11.1.1. Securing Insurance. Distributor shall secure and maintain in effect during the Term the following types of insurance in such amounts as specified by K18 BIOMIMETIC HAIRSCIENCE in writing to cover all claims, damages, costs, expenses and liabilities arising out of bodily harm (including without limitation, death or personal injury) or property damage that may occur in connection with the K18 BIOMIMETIC HAIRSCIENCE Products and any other obligations of Distributor pursuant to the terms of this Agreement:

a) Fire and property damage insurance with a limit of liability sufficient to cover the loss of any and all K18 BIOMIMETIC HAIRSCIENCE Products delivered to Distributor for which Distributor has not paid K18 BIOMIMETIC HAIRSCIENCE;

b) General liability insurance with a limit of liability of not less than Five Hundred Thousand Dollars ($500,000); and

c) Workers compensation insurance, or such similar insurance as, may be required by any governmental authority located within the Territory which has jurisdiction over employees in the performance of services under this Agreement.

11.1.2. <u>Copies of Policy.</u>  Such insurance policies shall name K18 BIOMIMETIC HAIRSCIENCE as an additional insured and may not be cancelled or modified unless K18 BIOMIMETIC HAIRSCIENCE is first notified in writing. Distributor shall deliver to K18 BIOMIMETIC HAIRSCIENCE certificates of insurance and such additional assurances and evidence of insurance required by K18 BIOMIMETIC HAIRSCIENCE (including, without limitation, copies of insurance policies certified by an authorized representative of the insurer) as K18 BIOMIMETIC HAIRSCIENCE may request from time to time.

11.1.3. <u>Securing Insurance by K18 BIOMIMETIC HAIRSCIENCE.</u> During the Term, K18 BIOMIMETIC HAIRSCIENCE shall, at its sole cost and expense, maintain general liability and product liability insurance policies with reputable insurance companies in such amounts and with such deductibles that are reasonably acceptable to Distributor, and Distributor shall be named as an additional insured on such insurance policies.  K18 BIOMIMETIC HAIRSCIENCE shall, at Distributor's request, provide to Distributor proof of such insurance coverage.  Each insurance policy shall provide that it shall not be modified, cancelled, not renewed or terminated unless Distributor is given thirty (30) days prior written notice thereof.

## 12. <u>REGULATORY</u>

K18 BIOMIMETIC HAIRSCIENCE and Distributor shall be work together (at the expense of K18 BIOMIMETIC HAIRSCIENCE) to obtain all regulatory approvals (for the joint benefit of K18 BIOMIMETIC HAIRSCIENCE and Distributor) as may be required in connection with the distribution, marketing and sale of the K18 BIOMIMETIC HAIRSCIENCE Products in the Territory in each jurisdiction where such approval is required to be obtained.  Distributor shall provide to K18 BIOMIMETIC HAIRSCIENCE, upon reasonable request, materials in its possession and access to their employees that K18 BIOMIMETIC HAIRSCIENCE reasonably determines to be relevant to any regulatory approval sought or required to be obtained by it with respect to the distribution, marketing or sale of the K18 BIOMIMETIC HAIRSCIENCE Products.

## 13. <u>INTELLECTUAL PROPERTY</u>

### 13.1.     <u>Ownership of the Trademarks and Patents.</u>

Distributor acknowledges that K18 BIOMIMETIC HAIRSCIENCE owns the K18 BIOMIMETIC HAIRSCIENCE Trademarks and the K18 BIOMIMETIC HAIRSCIENCE IP.  Distributor's right to use the K18 BIOMIMETIC HAIRSCIENCE IP is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement.  Distributor's unauthorized use of any of the K18 BIOMIMETIC HAIRSCIENCE IP constitutes a material breach of this Agreement and an infringement of K18 BIOMIMETIC HAIRSCIENCE's rights to the K18 BIOMIMETIC HAIRSCIENCE Trademarks.  This Agreement does not confer on Distributor any goodwill or other interests in the K18 BIOMIMETIC HAIRSCIENCE IP.  Distributor's use of the K18 BIOMIMETIC HAIRSCIENCE IP and any goodwill established thereby inures to K18 BIOMIMETIC HAIRSCIENCE's exclusive benefit.  All provisions of this Agreement applicable to the K18 BIOMIMETIC HAIRSCIENCE IP apply to any additional or substitute trademarks, service marks and trade dress K18 BIOMIMETIC HAIRSCIENCE authorizes Distributor to use. Distributor may not at any time during or after the Term contest, or assist any other person in contesting, the validity, enforceability or ownership of any of the K18 BIOMIMETIC HAIRSCIENCE IP.  Neither Distributor nor any of its Affiliates shall directly or indirectly (a) register, or attempt to register, any of the K18 BIOMIMETIC HAIRSCIENCE IP or any other name, trademark, service mark or identifying symbol that is confusingly similar to any of the K18 BIOMIMETIC HAIRSCIENCE Trademarks or a colorable imitation thereof; or (b) interfere with K18 BIOMIMETIC HAIRSCIENCE's or its Affiliates' efforts to obtain registration or ownership of any name, trademark, service mark, or other identifying symbol anywhere in the world. Distributor agrees to execute (and/or file) any documents deemed necessary by K18 BIOMIMETIC HAIRSCIENCE or its counsel to obtain protection for the K18 BIOMIMETIC HAIRSCIENCE IP or to maintain their continued validity and enforceability, including, without limitation, a registered user or license agreement. K18 BIOMIMETIC HAIRSCIENCE reserves the right to use the K18 BIOMIMETIC HAIRSCIENCE IP in the

Territory and to grant others the right to use such K18 BIOMIMETIC HAIRSCIENCE Trademarks with products not covered under this Agreement. For purposes of this Agreement, "K18 BIOMIMETIC HAIRSCIENCE IP" means any patents, copyrights, trademarks (which includes the K18 BIOMIMETIC HAIRSCIENCE Trademarks), applications for patent, claims under any patent, copyright, or trademark, trade dress, trade secrets, concepts, ideas, know-how, inventions, discoveries, technical information, processes, techniques, recipes, formulas, reports, process designs and all of their equivalents, in any jurisdiction, regardless of medium or form, and regardless of whether it represents a modification of, improvement to, or derivation of any of K18 BIOMIMETIC HAIRSCIENCE's products or claims under K18 BIOMIMETIC HAIRSCIENCE's patents.

**13.2.**     <u>**Use of the K18 BIOMIMETIC HAIRSCIENCE Trademarks.**</u>

Distributor may only use the K18 BIOMIMETIC HAIRSCIENCE Trademarks in connection with the sale of K18 BIOMIMETIC HAIRSCIENCE Products, all in accordance with this Agreement. Distributor agrees to use the K18 BIOMIMETIC HAIRSCIENCE Trademarks for the sole identification of K18 BIOMIMETIC HAIRSCIENCE (and specifically may not co-brand the K18 BIOMIMETIC HAIRSCIENCE Trademarks with any names or marks of Distributor), provided Distributor identifies itself as the independent owner thereof in the manner K18 BIOMIMETIC HAIRSCIENCE prescribes. Distributor agrees to use the K18 BIOMIMETIC HAIRSCIENCE IP as K18 BIOMIMETIC HAIRSCIENCE prescribes in connection with the sale of K18 BIOMIMETIC HAIRSCIENCE Products, including affixing all trademark, copyright, and patent notices required by K18 BIOMIMETIC HAIRSCIENCE. Distributor may not use any of the K18 BIOMIMETIC HAIRSCIENCE IP (or any abbreviation, modification or colorable imitation) as part of any corporate or legal business (including as an electronic media identifier, such as a website, web page or domain name), name or in any other manner not expressly authorized by K18 BIOMIMETIC HAIRSCIENCE in writing.

**13.3.**     <u>**Discontinuance of Use of K18 BIOMIMETIC HAIRSCIENCE Trademarks.**</u>

If, in K18 BIOMIMETIC HAIRSCIENCE's judgment, it becomes advisable at any time for K18 BIOMIMETIC HAIRSCIENCE and/or Distributor to modify or discontinue use of any of the K18 BIOMIMETIC HAIRSCIENCE Trademarks and/or use one or more additional or substitute trademarks, service marks or trade dress, Distributor agrees to comply with K18 BIOMIMETIC HAIRSCIENCE's directions within a reasonable time after notice. K18 BIOMIMETIC HAIRSCIENCE, without prior notice to Distributor, shall not alter or modify the K18 BIOMIMETIC HAIRSCIENCE Trademarks in the Territory. K18 BIOMIMETIC HAIRSCIENCE will have no liability or obligation whatsoever with respect to any such required modification or discontinuance of any K18 BIOMIMETIC HAIRSCIENCE Trademark or the promotion of a substitute trademark, service mark or trade dress.

**13.4.**     <u>**Notification of Infringements and Claims.**</u>

Distributor must notify K18 BIOMIMETIC HAIRSCIENCE immediately as provided in Section 19.4 herein of any apparent or claimed infringement of or challenge to Distributor's use of any of the K18 BIOMIMETIC HAIRSCIENCE IP, or any claim by another person of any rights in any of the K18 BIOMIMETIC HAIRSCIENCE IP that distributor becomes aware of. Distributor may not communicate with any person, other than K18 BIOMIMETIC HAIRSCIENCE and its counsel, in connection with any such infringement, challenge or claim. K18 BIOMIMETIC HAIRSCIENCE will have sole discretion to take such action as deemed appropriate in any event, and will have the right to control exclusively any litigation or administrative office proceeding arising out of any such infringement, challenge or claim or otherwise relating to any of the K18 BIOMIMETIC HAIRSCIENCE IP. Distributor must sign any and all documents (so long as Distributor believes them to be true and accurate and they have been reasonably approved by Distributor's counsel), render such assistance and do such things as may be advisable (all at the expense of K18 BIOMIMETIC HAIRSCIENCE, including the Distributor's reasonable legal fees) in the opinion of K18 BIOMIMETIC HAIRSCIENCE's counsel to protect K18 BIOMIMETIC HAIRSCIENCE's interests in any litigation or office or other administrative proceeding or otherwise to protect K18 BIOMIMETIC HAIRSCIENCE's interests in the K18 BIOMIMETIC HAIRSCIENCE IP.

**13.5.**     <u>**Registered User Agreements.**</u>

Distributor must execute any documents that K18 BIOMIMETIC HAIRSCIENCE or its counsel deem reasonably necessary to obtain protection for the K18 BIOMIMETIC HAIRSCIENCE IP or to maintain their continued

validity and enforceability, including registered user agreements so long the same are in form and substance reasonably acceptable to Distributor and its counsel. Upon the termination or expiration of this Agreement, Distributor agrees to do everything reasonably necessary to ensure that Distributor ceases to be a registered user of the K18 BIOMIMETIC HAIRSCIENCE IP, and Distributor hereby appoints K18 BIOMIMETIC HAIRSCIENCE as Distributor's attorney to execute any documents and to do such things as may be necessary for this purpose. K18 BIOMIMETIC HAIRSCIENCE agrees to pay for all costs of preparation, recordation and cancellation of the registered user agreement and any other reasonable costs incurred by Distributor in complying with this Section 13.5.

### 13.6.    Indemnification of Distributor.

So long as Distributor is not in breach of this Section 13, K18 BIOMIMETIC HAIRSCIENCE shall indemnify, defend and hold Distributor harmless from and against any intellectual property claim relating to the K18 BIOMIMETIC HAIRSCIENCE Trademarks and/or K18 BIOMIMETIC HAIRSCIENCE IP or resulting from Distributor's sale or possession of Products.

## 14. CONFIDENTIALITY.

### 14.1.    Confidential Information.

Distributor agrees to treat as confidential and not to disclose in any way whatsoever, without the prior written consent of K18 BIOMIMETIC HAIRSCIENCE, or use for purposes other than for the purposes of selling the K18 BIOMIMETIC HAIRSCIENCE Products in accordance with this Agreement, any financial, business, customer or technical information, including, without limitation, information relating to K18 BIOMIMETIC HAIRSCIENCE product designs and formulations, marketing strategies and business methods, costs and expenses, pricing information, and customer contacts, previously or hereafter supplied to or acquired or otherwise learned by the Distributor or its officers, employees or representatives (the "**K18 Confidential Information**"). Distributor may, without any obligation to do so, disclose certain information to K18 BIOMIMETIC HAIRSCIENCE that is confidential and/or proprietary, including but not limited to information related to the identity of Distributor's customers and customer contacts, data regarding purchases by Distributor's customers, financial data, data relating to Distributor's personnel, marketing plans, promotional plans, strategies, business methods and business plans (the "**Distributor Confidential Information**" and together with K18 Confidential Information, the "**Confidential Information**"). K18 BIOMIMETIC HAIRSCIENCE will not use any Distributor Confidential Information to the competitive disadvantage of Distributor or disclose or reveal any Distributor Confidential Information to any third parties without the written consent of Distributor or pursuant to a validly issued court order. K18 BIOMIMETIC HAIRSCIENCE will promptly notify Distributor of any request made by any party in any action, suit or proceeding for the disclosure of any Distributor confidential information and K18 BIOMIMETIC HAIRSCIENCE will cooperate with all efforts undertaken by Distributor to limit or prevent such disclosure. Each party agrees to limit access to any Confidential Information of the other to those of its officers, employees or representatives who are required by their duties to have knowledge or such information for purposes of this Agreement. Each party agrees to inform each such officer, employee or representative of its obligations hereunder and to require each such officer, employee or representative to agree not to disclose such information to others or to use such information except for the purposes of this Agreement. Each party shall be responsible for the breach by any of its officers, employees or representatives of the terms of this Agreement. The obligations set forth in this Section 14.1 shall not in any way restrict or impair a party's right and privilege to use and disclose to others any information which is now or hereafter becomes part of information in the public domain, other than through a breach of such party's obligations hereunder, and as such, available to the public at large or which hereafter becomes lawfully available to a party from any third party which is not then under any confidentiality obligation to the other party. Each party's obligations under this Section 14.1 shall survive termination of this Agreement for any reason. Upon termination of this Agreement, or at any time upon a party's request, a party in possession of any Confidential Information of the other shall return to the other all records, whether written, recorded or otherwise, of the Confidential Information, whether such records were made by K18 BIOMIMETIC HAIRSCIENCE or by the Distributor, together with any and all copies of said records.

### 14.2.    Breach.

The parties acknowledges that a breach or threatened breach of any of the provisions of Section 14.1 will result in immediate and irreparable harm and, as such, remedies at law for such a breach may be inadequate.

Accordingly, each party shall be entitled to temporary, preliminary and permanent injunctive relief for any such breach or threatened breach. Each party shall have the right to institute an action in an appropriate court for specific performance of the aforementioned provisions. Nothing contained herein shall be construed as limiting either party's rights to any other remedies, at law or in equity, including immediate termination of this Agreement and the recovery of damages from the Distributor.

**15. TERMINATION.**

**15.1. Reasons for termination.**

15.1.1. Event of Default. The following actions or events shall constitute an "Event of Default" under this Agreement:

  a) Failure by either party to perform any of the covenants, duties or obligations, set forth in this Agreement to be performed by such party that is not cured (if curable) within thirty (30) days following written notice of such default from the non-defaulting party to the defaulting party;

  b) A material breach by a party of any representation and warranty expressly, set forth in this Agreement;

  c) Distributor's failure, subject to the provisions of Sections 4 and 8, to meet the Minimum Purchase Requirements;

  d) Any material non-compliance by Distributor with any of K18 BIOMIMETIC HAIRSCIENCE's standards and policies provided to Distributor, including, without limitation, any non-compliance that is deemed by K18 BIOMIMETIC HAIRSCIENCE to injurious to its brand image; and

  e) (i) The insolvency of a party, or a party's failure generally to pay its debts as such debts become due; (ii) a general assignment by a party for the benefit of its creditors, or any similar arrangement with its creditors by a party; (iii) the entry of a judgment of insolvency against a party; (iv) the filing by a party of a petition for relief under applicable bankruptcy, insolvency, or similar debtor relief laws; (v) the filing of a petition for relief under applicable bankruptcy, insolvency or similar debtor relief laws by any person against a party which is consented to by such party; (vi) the appointment (or petition or application for appointment) of a receiver, custodian, trustee, conservator, or liquidator to oversee all or any substantial part of a party's assets or the conduct of its business; (vii) any action by a party for dissolution of its operations; or (viii) any other similar proceedings in any relevant jurisdiction affecting any party.

15.1.2. Remedies for Event of Default. Subject to the terms of this Agreement, if any Event of Default shall have occurred, the non-defaulting party shall have the right to terminate this Agreement effective upon notice of termination delivered to the defaulting party, as well as the right to exercise against the defaulting party any other rights and remedies available to the non-defaulting party under this Agreement or at law or in equity.

15.1.3. K18 BIOMIMETIC HAIRSCIENCE's Ability to Terminate for Specific Events. K18 BIOMIMETIC HAIRSCIENCE may immediately terminate this Agreement upon notice of termination delivered to Distributor in the event of;

  a) Any material change in the ownership, management or control of Distributor, including, but not limited to, a change of fifty percent (50%) or more of Distributor's officers, directors or managing agents or any sale of fifty percent (50%) or more of Distributor's assets or business or fifty percent (50%) or more of the equity or voting interest in Distributor other than the transfer of ownership of equity interests in Distributor for bona fide estate planning purposes;

  b) The levy of any attachment against Distributor or a material portion of its assets or property, or the transfer, sale or assignment of a material portion of its assets or property, other than a transfer of assets to an affiliate of Distributor in connection with a corporate restructuring or consolidation, or transfer of assets to an unrelated third party with the prior written consent of K18 BIOMIMETIC HAIRSCIENCE, which consent will not be unreasonably withheld (it being

14

understood that it shall not be unreasonable for K18 BIOMIMETIC HAIRSCIENCE to withhold its consent to a transfer, *inter alia*, to a direct competitor of K18 BIOMIMETIC HAIRSCIENCE or to a party whose business or reputation could, in K18 BIOMIMETIC HAIRSCIENCE's judgment, impair the image of K18 BIOMIMETIC HAIRSCIENCE or its products in the marketplace);

c)  Any misrepresentation by Distributor concerning the individuals and or entities who own Distributor's assets or business or the ownership interest held by any individual or entity;

d)  Any assignment or attempted assignment by Distributor of all or any portion of its rights or obligations under this Agreement to any person or entity without K18 BIOMIMETIC HAIRSCIENCE's prior written consent;

e)  Distributor's failure to promptly notify K18 BIOMIMETIC HAIRSCIENCE of any change in its name, or any sale of all of its business.

15.1.4.  <u>K18 BIOMIMETIC HAIRSCIENCE's Ability to Not Offer Extension Term.</u>  K18 BIOMIMETIC HAIRSCIENCE may terminate this Agreement at the conclusion of the Initial Term or the conclusion of the Extension Term if during such Term or such Extension Term, as applicable, there is a sale to an independent third party of fifty percent (50%) or more of K18 BIOMIMETIC HAIRSCIENCE capital stock or other ownership interests, assets or business (a "K18 BIOMIMETIC HAIRSCIENCE Change of Control").

15.1.5.  <u>Distributor's Ability to Terminate for Specific Events.</u> Distributor may immediately terminate this Agreement upon notice of termination delivered to K18 BIOMIMETIC HAIRSCIENCE in the event of:

a)  The levy of any attachment against K18 BIOMIMETIC HAIRSCIENCE or a material portion of its assets or property, or the transfer, sale or assignment of a material portion of its assets or property, other than a transfer of assets to an affiliate of K18 BIOMIMETIC HAIRSCIENCE in connection with a corporate restructuring or consolidation, or transfer of assets to an unrelated third party with the prior written consent of Distributor, which consent will not be unreasonably withheld (it being understood that it shall not be unreasonable for Distributor to withhold its consent to a transfer, *inter alia*, to a direct competitor of Distributor or to a party whose business or reputation could, in Distributor's judgment, impair the image of Distributor or its products in the marketplace); or

b)  K18 BIOMIMETIC HAIRSCIENCE's failure to promptly notify Distributor of any change in its name.

15.1.6.  <u>Intentionally left blank.</u>

15.1.7.  <u>Other Appointments.</u>  Upon written notice by K18 BIOMIMETIC HAIRSCIENCE to Distributor of any Final Breach or termination of this Agreement for any reason, K18 BIOMIMETIC HAIRSCIENCE may appoint other distributors to sell some or all of K18 BIOMIMETIC HAIRSCIENCE Products to customers located in all or any portion of the Territory and may immediately begin shipping product to such distributors.  In addition, during the Term, in the event Distributor fails to maintain an adequate and representative inventory, in accordance with Exhibit F, of the K18 BIOMIMETIC HAIRSCIENCE Products (including New Product Lines), K18 BIOMIMETIC HAIRSCIENCE may appoint other distributors to sell that product line to PBIOs located in all or any portion of the Territory and may immediately begin shipping product to such distributors.

**15.2.**  <u>**Rights and Obligations on Termination.**</u>

15.2.1.  <u>Obligations of Distributor.</u>  Termination shall not release or affect, and this Agreement shall remain fully operative as to, any obligations of or liabilities incurred by Distributor prior to the effective date of such termination; provided however, that all indebtedness of Distributor to K18 BIOMIMETIC HAIRSCIENCE of any kind shall become immediately due and payable within fifteen (15) days of the effective date of termination, and K18 BIOMIMETIC HAIRSCIENCE may deduct from any sums it owes to Distributor any sums owed by Distributor to K18 BIOMIMETIC HAIRSCIENCE.  Within



fifteen (15) days after the date this Agreement is terminated, Distributor shall provide to K18 BIOMIMETIC HAIRSCIENCE a current inventory of the K18 BIOMIMETIC HAIRSCIENCE Products Distributor has on hand and any other information reasonably requested by K18 BIOMIMETIC HAIRSCIENCE.

15.2.2. <u>Obligations of K18 BIOMIMETIC HAIRSCIENCE.</u> Termination shall not release or affect, and this Agreement shall remain fully operative as to, any obligations of or liabilities incurred by K18 BIOMIMETIC HAIRSCIENCE prior to the effective date of such termination.

15.2.3. <u>Purchase Orders and Product Returns.</u> Upon the termination of this Agreement, K18 BIOMIMETIC HAIRSCIENCE shall have the right at its option, to (a) cancel any or all accepted purchase orders, which provide for delivery after the effective date of Termination; and (b) should it elect to fill such orders, fill them on terms of cash in advance or whatever other payment terms it specifies, in its sole discretion. K18 BIOMIMETIC HAIRSCIENCE shall, at Distributor's option, repurchase Distributor inventory of K18 BIOMIMETIC HAIRSCIENCE Products in Distributor's possession as of the termination date at the actual price paid by the Distributor on a first in first out basis. Distributor shall exercise its option under this Subsection by providing K18 BIOMIMETIC HAIRSCIENCE in writing no later than one hundred twenty (120) days after the date of termination with a current inventory of the K18 BIOMIMETIC HAIRSCIENCE Products on hand. Notwithstanding anything contained in Section 14.2.3 of this Agreement to the contrary, in the event that Distributor does not elect to offer the Products for repurchase then, provided that Distributor has complied with all of the terms of this Agreement, Distributor may continue to distribute its remaining inventory of K18 BIOMIMETIC HAIRSCIENCE Products to PBIOs during a period of one hundred twenty (120) days following the termination date, subject to and in compliance with the other terms of this Agreement.

15.2.4. <u>Cease as Distributor.</u> Upon the termination of this Agreement for any reason, Distributor shall cease immediately and permanently to hold itself out as an authorized Distributor of any K18 BIOMIMETIC HAIRSCIENCE Products. Following the termination of this Agreement, at K18 BIOMIMETIC HAIRSCIENCE's request, within five (5) days of such request, Distributor should notify its customers and others that it has ceased to be a Distributor of the K18 BIOMIMETIC HAIRSCIENCE Products.

**15.3.      Post Relationship Obligations.**

15.3.1. **Distributor's Prohibited Acts upon Termination.** Upon receipt of notice of termination of this Agreement, neither party shall do anything which might damage the other's sales, goodwill or business, neither will disparage the other, and Distributor shall not disparage any of the Products. In particular, Distributor will not do any of the following: (a) exchange or offer to exchange any products from any other manufacturer or supplier's product line for K18 BIOMIMETIC HAIRSCIENCE Products; or (b) directly or indirectly transship, redistribute, divert or sell any K18 BIOMIMETIC HAIRSCIENCE Products to or through any unauthorized class of trade, outlets or channels of distribution including but not limited to, those identified in section 1.2 above.

15.3.2. **Discontinue Use of K18 BIOMIMETIC HAIRSCIENCE Trademarks and Confidential Information.** Upon the termination of expiration (without extension) of this Agreement, Distributor will, at its own cost:

a)   Discontinue the marketing and sale of K18 BIOMIMETIC HAIRSCIENCE Products;

b)   Take such action as may be required to cancel all name registrations or corporate names associated, affiliated with, or that include K18 BIOMIMETIC HAIRSCIENCE;

c)   Discontinue any marketing, including but not limited to internet marketing, directing or indirectly relating to K18 BIOMIMETIC HAIRSCIENCE;

d)   Remove from all warehouses, offices, or stores under Distributor's control, all signs, displays, advertising materials, packaging, and other materials and supplies which display the K18 BIOMIMETIC HAIRSCIENCE Trademarks or any distinctive features, images, or designs associated with K18 BIOMIMETIC HAIRSCIENCE at Distributor's Expense;

16

e)  Cease to use all K18 Confidential Information and return to K18 BIOMIMETIC HAIRSCIENCE all K18 Confidential Information that has been provided to Distributor;

f)  [intentionally left blank];

g)  Take all such actions as may be required to cancel, withdraw, and deregister all governmental and regulatory registrations with the relevant authorities relating to Distributor's appointment as K18 BIOMIMETIC HAIRSCIENCE's distributor in the Territory (if applicable); and

h)  Within thirty (30) days after the effective date of the termination or expiration, furnish K18 BIOMIMETIC HAIRSCIENCE evidence satisfactory to K18 BIOMIMETIC HAIRSCIENCE of Distributor's compliance with the foregoing obligations.

Upon termination or expiration of this Agreement, K18 BIOMIMETIC HAIRSCIENCE will cease to use all Distributor Confidential Information and will return to Distributor all of Distributor Confidential Information in its possession and destroy any copies (hard or electronic) thereof.

## 16.  DISPUTES AND GOVERNING LAW

### 16.1.  Mandatory Forum Selection for Claims.

Each party hereto, in case of any controversy or dispute arising out of or relating to this Agreement, forsaking any other jurisdiction, shall submit to the sole, proper and exclusive jurisdiction and the venue of court of San Francisco County, California, USA or the United States District Court for the Northern District of California, USA.

### 16.2.  Attorneys' Fees.

In the event that any action or proceeding is brought in connection with this Agreement, the prevailing Party in such action or proceeding shall be entitled to have all of its court costs, reasonable attorneys' and paralegals' fees and expenses, reasonable expenditures for documentary and expert evidence, and all other reasonable costs and expenses actually incurred in connection with such action or proceeding paid by the non-prevailing Party in such action or proceeding. The Person determining such action or proceeding shall specifically determine the prevailing Party in such action or proceeding for purposes of this Section.

### 16.3.  Governing Law.

This Agreement has been made and shall be governed by, and interpreted and construed in accordance with, the internal laws of the State of California, USA, regardless of the place of execution and intended performance and independent of the forum where it may come up for enforcement or construction. All instruments executed pursuant to the terms hereof shall likewise be governed by the laws of the State of California, and all provisions of this Agreement and all instruments pursuant to the terms hereof shall be construed in accordance with the standards and customs of the industry as practiced in California. The parties expressly exclude the application of the 1980 United Nations Convention on the International Sale of Goods (if applicable).

## 17.  COMPLIANCE WITH LAWS.

### 17.1.  Compliance.

Each party shall comply with all statutes and regulations governing or otherwise applicable to the sale and distribution of K18 BIOMIMETIC HAIRSCIENCE Products, including but not limited to, U.S. federal and state food, drug, and cosmetic laws and antitrust and competition laws. Each party agrees to defend, hold harmless and indemnify the other from and against fines or penalties arising from either the breach by the indemnifying party of its obligations under this section. Distributor warrants to K18 BIOMIMETIC HAIRSCIENCE that it has informed K18 BIOMIMETIC HAIRSCIENCE of all laws and regulations affecting the manufacture, sale, packaging and labelling of K18 BIOMIMETIC HAIRSCIENCE Products which are in force within the Territory or any part of the Territory ("**Local Regulations**") as of the Effective Date. Distributor shall give K18 BIOMIMETIC HAIRSCIENCE as much advance notice as reasonably possible of any prospective changes in the Local Regulations.

### 17.2.  Anti-Terrorism Laws.

Distributor certifies that neither Distributor nor any of its owners, affiliates, employees or anyone associated with Distributor is listed in the Annex to Executive Order 13224. (The Annex is available at http://www.state.gov/j/ct/rls/other/des/122570.htm). Distributor agrees not to hire or have any dealings with a person listed in the Annex. Distributor agrees to comply with and/or assist K18 BIOMIMETIC HAIRSCIENCE to the fullest extent possible in K18 BIOMIMETIC HAIRSCIENCE's efforts to comply with the Anti-Terrorism Laws, Executive Order, or other US laws implemented by the Office of Foreign Asset Control (OFAC). For such compliance, Distributor certifies, represents, and warrants that none of its property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Distributor and its owners are not otherwise in violation of any of the Anti-Terrorism Laws.

### 17.3.     Anti-Corruption and Anti-Bribery Laws.

Distributor represents and warrants that Distributor and its Affiliates do and shall comply with all applicable legal requirements against corrupt business practices, against bribery, against money laundering and against facilitating or supporting persons who conspire to commit crimes or acts of terror against any person or government. Distributor agrees that it will promptly notify K18 BIOMIMETIC HAIRSCIENCE in writing immediately of the occurrence of any event which renders the foregoing representations and warranties of this paragraph incorrect as well as any request or demand for any undue or suspicious financial or other advantage of any kind received by Distributor in connection with the performance of this Agreement. Additionally, within five business days of request, Distributor shall sign and return to K18 BIOMIMETIC HAIRSCIENCE a signed FCPA Compliance letter.

### 17.4     Anti-Boycott Laws.

Distributor: (a) shall comply with all US antiboycott laws and regulations, including, but not limited to, the Anti-Boycott Act of 2018 and the Internal Revenue Code (collectively, **"Antiboycott Laws"**); and (b) shall not take any action that violates the Antiboycott Laws.

### 17.5.     Import Licenses.

Distributor shall be responsible for obtaining any necessary import licenses or permits necessary for the entry of the K18 BIOMIMETIC HAIRSCIENCE Products into the Territory, or their delivery to the Distributor. Distributor shall be responsible for any customs duties, clearance charges, taxes, brokers' fees and other amounts payable in connection with the importation and delivery of the K18 BIOMIMETIC HAIRSCIENCE Products.

## 18. REPRESENTATIONS, WARRANTIES, AND COVENANTS

### 18.1.     Mutual Representations.

Each party hereby represents, covenants, and warrants to the other party as following:

a) Such party is a corporation or limited liability company, as applicable, validly organized validly existing and in good standing under the laws of the jurisdiction in which it is organized.

b) Such party (i) has the power and authority and the legal right to enter into this Agreement and to perform its obligations hereunder and (ii) has taken all necessary corporate action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered on behalf of such party, and constitutes a legal, valid, binding obligation, enforceable against such party in accordance with its terms.

c) All necessary consents, approvals and authorizations of all governmental authorities and other persons required to be obtained by such party in connection with this Agreement have been obtained.

d) The execution and delivery of this Agreement and the performance of such party's obligations hereunder do not conflict with or violate any requirement of applicable laws or regulations or any agreement, instrument or undertaking to which it is a party or by which it is bound.

## 19. GENERAL PROVISIONS

### 19.1.     Pandemic Stay.

The terms of this Agreement shall be subject to a Pandemic Stay. "Pandemic Stay" shall mean if any PBIO in the Territory is unable to operate at its normal capacity due to government limitations on business operations,



including, but not limited to, customer capacity, then, at Distributor's sole option, the Term and all Minimum Product Purchase Requirements will be stayed for the duration of the limitation on business operations. Immediately upon having knowledge of a Pandemic Stay, Distributor shall notify K18 BIOMIMETIC HAIRSCIENCE of each such Pandemic Stay.

**19.2.    No Other Representations.**

Each party acknowledges that the other party has not made any representation to it other than those, which are contained herein.

**19.3.    Entire Agreement.**

This Agreement, including the Exhibits attached hereto and incorporated herein by this reference as an integral part of this Agreement, and that certain Non-Disclosure Agreement dated as of 14 JULY 2021 by and between the parties constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous proposals, oral or written, and all negotiations, conversations, or discussions heretofore had between the parties related to the subject matter of this Agreement.

**19.4.    Notices.**

Any notices given under this Agreement shall be in writing and shall be deemed duly given if sent by overnight carrier or by registered or certified mail, postage prepaid  or by e-mail, with a copy by overnight carrier or by registered or certified mail, postage prepaid, and if addressed as follows:

- **To K18 BIOMIMETIC HAIRSCIENCE:** AQUIS HAIRSCIENCES INC., 621 SANSOME STREET, SAN FRANCISCO, CA 94111, USA, ATTN: SUVEEN SAHIB, Email: suveen@aquis.com.

- **To Distributor**: CSP LOGISTICS, 1 avenue du piot 30660 GALLARGUES LE MONTUEUX, ATTN WINCKER Jean Philippe email: jp.wincker@cspgroupe.com with a copy to: CSP OFFICES, ATTN: CORNEVIN MAELYS email:m.cornevin@cspgroupe.com.

Notice so given shall be effective upon (a) receipt by the party to which notice is given, or (b) on the fifth (5) day following the date such notice was sent by U.S. mail or on the next business day after deposit with an overnight courier service, whichever occurs first.  Either party may designate another address for notice by giving written notice as provided herein.

**19.5.    Amendment.**

This Agreement shall not be deemed or construed to be modified, amended, rescinded, canceled or waived, in whole or impart, except by a written amendment signed by Distributor and an officer of K18 BIOMIMETIC HAIRSCIENCE, which specifically states that it constitutes an amendment to this Agreement.

**19.6.    Counterparts.**

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  Counterparts may be delivered by electronic mail (including pdf) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes

**19.7.    English.**

This Agreement has been executed in English.  All communication between K18 BIOMIMETIC HAIRSCIENCE and Distributor will be in English.  If translation of any communication is required, Distributor is responsible for the costs incurred to accomplish this, including any cost K18 BIOMIMETIC HAIRSCIENCE incurs in order to verify that a translation provided by Distributor is accurate.  Distributor acknowledges that any translation, whether commissioned or paid for by K18 BIOMIMETIC HAIRSCIENCE or Distributor, shall be the property of K18 BIOMIMETIC HAIRSCIENCE and constitute a part of the Confidential Information. Distributor shall execute any assignments or other documents necessary to affect K18 BIOMIMETIC HAIRSCIENCE's ownership of such translations.

**19.8.    Intentionally Left Blank.**

**19.9.    Disclosure of Agreement: Public Announcement.**

19

The parties shall keep confidential and not make any public announcement or disclose to any third person the existence or any terms of this Agreement or information with respect to the transactions contemplated by this Agreement which is not generally known to the public.  Notwithstanding the foregoing, the parties shall be permitted to disclose such information: (a) to the extent required under applicable law (including reporting requirements applicable to public companies); and (b) to any person on a "need to know" basis whose assistance is required to consummate the transactions described in this Agreement; provided, however, that each party (as the case may be) shall (i) advise such person of the confidential nature of such information, and (ii) use reasonable efforts to cause such person to maintain the confidentiality of such information.

[signature pages follow]

IN WITNESS WHEREOF, the parties have signed this Agreement effective as of the date first written above.

**CSP LOGISTICS**

By: _____

Name:  WINCKER JEAN PHILIPPE

Title:  CEO

**AQUIS HAIRSCIENCES INC**

By: _____

Name:  SUVEEN SAHIB

Title    CO FOUNDER & CEO

REVIEWED
By suveensahib at 2:48 pm, Jul 15, 2021

21

Exhibit A: K18 BIOMIMETIC HAIRSCIENCE Trademarks

K18 BIOMIMETIC HAIRSCIENCE

Exhibit B: Definitions

Curable, Non-Curable and Final Breaches.  "Non-curable breaches" shall mean any breach by Distributor of subsections 2.3, 8.2, or 8.3 of this Agreement. "Curable" breaches shall mean any breach of any other Term. "Final Breach" shall mean any Non-Curable Breach or any Curable Breach which, Distributor fails to cure within the time period prescribed in Subsection 15.1.

Diversion.  "Diversion" shall mean transshipping, redistributing, selling, reselling or delivering any K18 BIOMIMETIC HAIRSCIENCE Products directly or indirectly, through the internet or by other means to any of the following: (a) any class of trade other than PBIOs (as defined herein) including, but not limited to warehouse, food, drug, variety discount stores, online retailers, or discount chain stores; (b) any other unauthorized outlet as designated in writing by K18 BIOMIMETIC HAIRSCIENCE to Distributor; or (c) any account including, but not limited to any PBIO, outside of the Territory identified in Exhibit D attached hereto.

Force Majeure.  "Force Majeure" shall mean any event or condition, not existing as of the Effective Date, not reasonably foreseeable as of such date and not reasonably within the control of either party, which prevents in whole or material part the performance by one of the parties hereto of its obligations hereunder or which renders the performance of such obligations so difficult or costly as to make such performance commercially unreasonable. Additionally, Force Majeure shall include any pandemic, epidemic or the like generally having a negative effect on the business operations of PBIOs in the Territory, including the Covid pandemic, notwithstanding that it exists as of the Effective Date.

Product Purchase Requirement(s).  "Product Purchase Requirement(s)" shall mean the minimum quantities of K18 BIOMIMETIC HAIRSCIENCE Products which Distributor shall be required to purchase from K18 BIOMIMETIC HAIRSCIENCE on an annual or quarterly basis in accordance with the terms and conditions of Section 7.1 of this Agreement as adjusted by K18 BIOMIMETIC HAIRSCIENCE on an annual basis after consultation with Distributor.

PBIOs.  "PBIOs" shall mean Professional Beauty Industrial Outlets, which are licensed cosmetologists, hair stylists, accredited beauty salons, men's styling salons, beauty and barber schools, and professional beauty supply stores. PBIOs exclude the following:
   a)     Grocery stores
   b)     Food/Drug mass outlets
   c)     Mass retailers
   d)     Department stores
   e)     Online only locations without a brick-and-mortar store
   f)     E-commerce sites
   g)     International customers

Support Services.  "Support Services" shall mean warranty and continuing customer liaison services with respect to the K18 BIOMIMETIC HAIRSCIENCE Products.

Territory.  "Territory" shall mean those areas as provided in Section 2.3 and specifically described in Exhibit D attached hereto.

Exhibit C : K18 Hair Products

Exhibit D: Territory

Distributor has rights to distribute K18 BIOMIMETIC HAIRSCIENCE Products in the following geographic area (the "Territory"):

French Republic, including DOM-TOM (Clipperton, French Southern and Antarctic Lands, French Polynesia, French Guiana, Guadeloupe, Martinique, Mayotte, New Caledonia, Saint-Martin, Saint-Barthélemy, Saint Pierre and Miquelon, Reunion Island, and Wallis and Futuna)

<u>Exhibit E</u>: Purchase Order Form

Exhibit F: Price and Minimum Product Purchase Requirements

Price and Minimum Product Purchase Requirements. K18 BIOMIMETIC HAIRSCIENCE and Distributor shall have at a minimum three (3) months to negotiate and agree to Distributor's minimum order requirements (in U.S. Dollars) for the ensuing calendar year. Such agreement shall be appended to and made a part of this Agreement. In the event the parties do not reach an agreement regarding order minimums after good-faith discussions, the minimum order requirements shall revert back to the prior year. In the event the parties do not reach an agreement regarding order minimums for the initial year, unless the parties mutually agree otherwise, the Agreement shall be terminated subject to the provisions of the Agreement, specifically Sections 15.2 and 15.3.

27