# Exhibit 6

## RETAILER AGREEMENT

This Retailer Agreement (the "Agreement") is entered into effective this 13th day of August 2024 ("Effective Date") by and between K18, INC., a Delaware corporation having its principal place of business at 621 Sansome Street, San Francisco, California 94111, USA ("**K18**"), and SAS CSP Logistics, a company organized under the laws of France and having its principal place of business at  1 Allée du Piot 30660 Gallargues Le Montueux in France ("**Retailer**"). K18 and Retailer will hereinafter be referred collectively as "the Parties."

### Recitals

WHEREAS, K18 is in the business of manufacturing and selling a line of premium hair care products for both professional and consumer use;

WHEREAS, Retailer is in the business of selling consumer hair care products; and,

WHEREAS, K18 wishes to engage Retailer to sell certain consumer hair care products at retail locations, and Retailer accepts such engagement;

NOW, THEREFORE, in accordance with the foregoing premises, which are incorporated herein by this reference, and in exchange for the mutual covenants and promises contained herein, and other good and valuable consideration, the value and receipt of which is hereby acknowledged, the Parties hereto agree as follows.

1. **Term.**  This Agreement shall commence on August 13, 2024, and continue up to and including December 31, 2025. No extension or renewal of the Term will be applied to the Parties or this Agreement unless mutually agreed in writing and signed by duly authorized representatives of each Party.

2. **Non-Exclusivity.**  K18 hereby engages Retailer to sell, on a nonexclusive basis, the Products listed on Exhibit A during the Term.

3. **Sales Authorizations.** Retailer may sell the Products to retail end-user customers only at its owned and operated Bleu Libellule brick and mortar stores physically located in France and via its owned and operated website www.bleulibellule.com. All Retailer locations/channels must have a Professional Beauty/Hair Advisor - i.e., a person who has completed Product and Product use orientation provided by K18 or Retailer and who can provide, for example, technical or scientific knowledge specific to the Products and directions for proper and effective use of the Products - at all relevant times.

4. **Sales Limitations.** For sales conducted on www.bleulibellule.com, Retailer shall comply with K18's digital requirements in effect at the time.

Retailer acknowledges and agrees that it is prohibited from selling the Products through vending or dispensing machines or any kind, to customers or other parties that Retailer knows, or has cause to believe after reasonable inquiry, purchase Products with the intent of reselling Products (i) outside the European Economic Area, the accession countries to the European Union, and Switzerland through any means, (ii) through vending or dispensing

machines of any kind, or (iii) via third-party e-commerce sites including, by way of example, Amazon or similar consumer multi-brand sales portal, or through TikTok Shop, Instagram Shop or other social media channels.

5. **New Products.** During the Term, K18 may, but is not required to, introduce new hair care products.  At K18's option, which will be exercised in K18's sole discretion and, if at all, in writing, K18 may offer Retailer the option to purchase such new hair care products.  Retailer will exercise this option, if at all, in writing, within 30 days of receipt of K18's offer. If Retailer exercises the option to purchase and sell such new hair care products, then such new hair care products will become Products, and this Agreement will immediately apply in full to such new hair care products. Nothing in this Agreement requires that K18 offer Retailer products other than Products.

6. **Discontinued Products.** At any time upon prior notice, K18 may discontinue Products or an individual Product, including a discontinuation of all sales of all Products if (a) K18 decides, in its sole discretion, to (i) discontinue distributing Products in France; or (ii) sell, convey, merge or otherwise transfer all, or a substantial portion of the part(s) of its business that is/are responsible for selling Products in France; or (b) K18 decides to change the manner in which it distributes or sells Products in France due to changes in applicable law or government enforcement or regulation after the Effective Date which, in K18's sole judgment, will adversely affect (w) claims that K18 may lawfully make about Products; (x) the use of ingredients in Product formulae; (y) other legal requirements applicable to the offer or sale of Products in France or (z) K18's ability to produce, market, advertise, promote, distribute or sell Products in France competitively.

7. **Pricing.**  Retailer's trade discount will be U.S. retail prices in effect at the time that K18 accepts Retailer's purchase order, less 50%. Prices will be listed in United States Dollars. K18 retains absolute discretion to establish and adjust the prices of Products sold to Retailer, to establish policies and discounts for volume purchases by Retailer, to establish and impose handling, packing, shipping and delivery charges, and to establish discounts for sales of Products to Retailer. Illustrative pricing is available on Exhibit B.

8. **Purchases and Purchase Orders.** Retailer agrees to purchase from K18, at minimum, the following amount of Products:

2024 - $200,000 USD

2025 - $540,000 USD

Retailer will order Products by submitting purchase orders in writing, by email, to K18, using the form illustrated in Exhibit C. Requested delivery dates and shipping instructions should be included on the order form. Purchase orders will not be binding on K18 unless and until accepted by K18's duly authorized representative, at which time the purchase order becomes irrevocable, except (i) as described in Section 5 regarding new products; or (ii) if this Agreement is subsequently terminated. K18 will have no liability to Retailer for rejecting any purchase order. No accepted purchase order will be modified, changed, or cancelled by Retailer without K18's written approval. All purchase orders, including any order

modified, changed, or cancelled with K18's written approval, will be deemed to incorporate the terms and conditions of this Agreement.

9. **Delivery.** All purchases by Retailer will be delivered by K18 Ex Works from K18's warehouse; provided, however, K18 may, in its sole discretion, at any time by written notice, change the delivery terms as frequently as K18 chooses. Retailer is responsible for arranging transport of all Products from K18's warehouse to Retailer's warehouse. All costs associated with such transport, including without limitation insurance, freight, taxes, duties, and charges associated with customs clearance, will be borne solely by Retailer. K18 reserves the right to change shipment and logistics arrangements upon thirty (30) days' prior notice to Retailer.

10. **Allocation.** K18 will use reasonable commercial efforts to fill accepted orders as promptly as practicable; provided, however, Retailer's orders will be subject to such allocations or delays as K18, in its sole discretion, may deem necessary or equitable in the event of any shortages of Products, production or delivery delays, or events of Force Majeure. K18 will not be liable to Retailer or to any person or entity if K18 fails to deliver Products by a specific date.

11. **Suspension.** K18 may, without liability to Retailer, suspend selling Products and shipping orders for Products previously accepted by K18, if K18 determines, in its sole discretion, that it is necessary or advisable to change the formula, ingredients or packaging of any Product for any reason. K18 will promptly notify Retailer in writing of a suspension due to a change in Product formulae, ingredients or packaging and provide Retailer with its best estimate of the probable length of the suspension; provided, however, K18 will have no liability if its estimate is materially different than the actual length of the suspension. Within five (5) days after receiving K18's notice of suspension, Retailer may cancel any orders for any such Products which have not already been shipped by K18.

12. **Payments.** Payments are due on a net30 basis from the date of K18's invoice.

13. **No Set-Off.** Under no condition will Retailer have any right to set-off, from the price of Products, any amount, claim, expense, liability, or obligation of any kind, actual or contingent, that K18 owes, or that Retailer alleges K18 may owe, to Retailer.

14. **Delinquency.** K18 will have no obligation to ship Products to Retailer during any time when Retailer is delinquent in payment of any outstanding sums owed to K18 or otherwise commits a default under this Agreement.

15. **Reporting.** Retailer will provide monthly sales and inventory reports in the form illustrated in Exhibit D. Such monthly sales report will include, but is not limited to, sales information by channel and SKU, and inventory.

16. **Business Records.** Retailer will maintain full, complete and accurate business records documenting, on a monthly basis, (i) Retailer's sales plans and results; (ii) on-hand inventory and transfer reports; and (iii) such other financial data and statistical information

as K18 may request for purposes of internal operational control, marketing purposes or to monitor Retailer's compliance with this Agreement. Retailer will produce copies of these records promptly upon request by K18.

17. **Control Forms.** At K18's request, Retailer will timely complete K18's operational and statistical control forms to enable K18 to develop Product statistics and demographic data, research new products, goods, services and marketing programs, and to respond to competitive and market changes, and will provide copies of such forms to K18 upon K18's request.

18. **Product Handling.** Retailer will observe K18's instructions for handling, rotating and storing Products and for maintaining environmental control systems in order to preserve the quality and integrity of Products. At no time will Retailer alter any labels, packaging or containers of any Products.

19. **Inspections.** At any time during normal business hours, K18's authorized representatives may enter Retailer's warehouse or brick and mortar stores to (i) inspect its condition; (ii) observe the manner in which Retailer handles, rotates and stores the Products; (iii) observe and interview Retailer's employees; (iv) take a physical inventory of the Products in Retailer's possession and review and copy Retailer's records relating to its inventory of the Products; and (v) otherwise evaluate Retailer's operations. Retailer hereby unconditionally grants authority to K18's authorized representatives to enter Retailer's warehouse or brick and mortar stores for the purpose of conducting such inspections.

20. **Distressed Products.** Retailer will not sell or distribute, and will, at K18's request, destroy any Distressed Products - i.e., Products which, in K18's sole opinion, are unfit for resale by Retailer by reason of (i) age; (ii) damage from freezing, heat, or mishandling; or (iii) other causes compromising the safety or integrity of Products - in Retailer's custody. Immediately after destroying Distressed Products, Retailer will provide K18 with written confirmation of the quantities, batch numbers, and SKUs of the Distressed Products that it has destroyed. K18 will reimburse Retailer for any direct costs that Retailer can substantiate that it incurred to destroy Distressed Products at K18's request if K18 determines, in its sole judgment, that the distress condition is not due to (i) Retailer's failure to handle, rotate or store the Products in accordance with K18's specifications, or (ii) the provider chosen by Retailer to transport the Products from K18's warehouse to Retailer's Warehouse; otherwise, Retailer will bear all expenses to destroy Distressed Products. The requirement that Retailer destroys Distressed Products will not preclude K18 from declaring Retailer in breach of this Agreement, if K18 determines that Retailer failed to handle, rotate or store the Products in accordance with K18's specifications.

21. **Product Recall or Withdrawal.** If, for any reason, either (i) K18 or any governmental authority recalls any of the Products, or (ii) K18 withdraws from selling Products in France, Retailer will immediately comply with K18's instructions and use its best efforts to ensure the swift, safe, and secure return of the recalled or withdrawn Products in Retailer's possession to a location that K18 designates in writing. Retailer will then comply with K18's further instructions to transport or destroy the Products subject to a recall or withdrawal.

4

K18 may reimburse Retailer for certain direct costs with respect to Products that Retailer returns or destroys pursuant to a recall or market withdrawal. Reimbursement will be limited to the sum of the following.

    **a.** **Original Costs.** Retailer's invoice price for purchased Products that it later returns or destroys pursuant to a recall or market withdrawal, based on the original purchase order.

    **b.** **Freight.** Retailer's documented freight, delivery and insurance expenses, in the case of returns, to return Products subject to a recall or withdrawal to K18's designated location.

    **c.** **Costs of Destruction.** Retailer's documented destruction expenses, in the case of destruction of Products subject to a recall or withdrawal. For the avoidance of doubt, the Cost of Destruction shall not include administrative overhead costs of Retailer.

Reimbursement, if any, will be paid to Retailer within 30 days after Retailer returns or destroys Products subject to a Product recall or withdrawal, and supplies documentation substantiating Retailer's freight, delivery, insurance and destruction expenses in connection with the return. Retailer understands and agrees that reimbursement of the foregoing amount is Retailer's exclusive remedy and Retailer will have no other claim or recourse against K18 under any legal theory for any direct or indirect costs, damages, expense, liability or claims arising from the purchase, sale or return of Products subject to a Product recall or withdrawal; that K18 may set-off from the payable reimbursement any monies then due and owing by Retailer to K18 under this Agreement; and that K18 may, at its option, replace some or all of the relevant Products as a means of reimbursement, in lieu of credit or payments, in whole or in part.

Excepting only claims based on breach of the warranty set forth in Section 25, Retailer understands and agrees that K18 will not be liable to any consumer in France to whom Retailer sold Products that later are subject to a recall or market withdrawal.

If any recall or withdrawal of any Products is due partially or solely to Retailer's willful acts, omissions, or negligence, K18 will not be obligated to reimburse Retailer for any amount pursuant to this Section, and may terminate Retailer for breach of this Agreement and pursue all other remedies available against Retailer under applicable law.

22. **Testers.** Testers will be created from Product inventory as needed by Bleu Libellule brick-and-mortar personnel. K18 will reimburse Retailer on a monthly basis for the cost of such testers. Retailer has no obligation to return any testers, but shall destroy them, in the event that this Agreement is terminated.

23. **Defective or Damaged Product.** K18 will reimburse Retailer for any defective or damaged merchandise, including retail end-user customer returns, which cannot be resold, on a monthly basis. Reimbursement will be at the cost purchased by Retailer. Retailer will destroy and properly dispose of such defective or damaged merchandise.

24. **Training.** K18 will provide Product training as necessary or as reasonably requested by Retailer.

25. **Warranty.** Exhibit E, attached hereto and incorporated herein by this reference, sets forth a form of continuing guarantee intended to relieve Retailer from responsibility if, through no fault of Retailer, Products sold by K18 to Retailer do not comply with K18's specifications. EXCEPT AS OTHERWISE SET FORTH IN EXHIBIT E, RETAILER UNDERSTANDS AND AGREES THAT K18 DISCLAIMS ALL OTHER, AND MAKES NO, EXPRESS OR IMPLIED WARRANTIES CONCERNING PRODUCT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

26. **No Warranty Extension.** Except as explicitly and specifically authorized by K18, Retailer is not authorized to extend to any other person or entity any warranty, whether express or implied, relating to any Product and will indemnify and hold K18 free and harmless from any claims brought by any person or entity resulting from (i) a warranty or representation made by Retailer not specifically authorized by K18 in writing; and (ii) Retailer's failure to effectively disclaim any express or implied warranty concerning any Product. Retailer's indemnity pursuant to this Section 26 will not preclude K18 from declaring Retailer in breach of this Agreement and pursuing all remedies available against Retailer under Applicable Law.

27. **Personal Data.** K18 and Retailer will not exchange any personal data.

28. **Intellectual Property.**

    a. **Definition.** "Intellectual Property" includes, but is not limited to, (i) the K18 trademark; (ii) the other trademarks, service marks, trade dress, trade names, words, designs, graphics, 3-dimensional objects, symbols, logos, slogans, domain names, URLs, social media handles, and other identifications of K18, K18's affiliates, or Products; (iii) all copyrights owned by K18 or K18's affiliates in advertising materials, educational materials, promotional materials, Product materials, marketing materials, websites, videos, presentations, and other forms of expression fixed in a medium; (iv) all patents owned or licensed by K18 or K18's affiliates; and (v) all know-how, technical information, and trade secrets owned or licensed by K18 or K18's affiliates.

    b. **Limited License.** Subject to the terms and conditions of this Agreement, K18 grants to Retailer a revocable, limited, non-exclusive right to use the specific K18 Intellectual Property that K18 designates in writing from time to time in connection with the marketing, distribution and sale of Products during the Term. Retailer will acquire no right, title or interest in the Intellectual Property other than a revocable, limited, non-exclusive right to use the Intellectual Property on the terms of this Agreement. Retailer understands and agrees that K18 and K18's affiliates hold and retain full ownership of the Intellectual Property and all goodwill therein, and that all use by Retailer is for, and inures to the benefit of, K18 and K18's affiliates. Retailer agrees to execute such documents that K18 reasonably requires to confirm this Section 28.b.

    c. **No Assistance.** Retailer will not, directly or indirectly, contest, or assist any other person to contest, the validity of K18's, or K18's affiliates', rights or interest in the Intellectual Property either during the Term or after this Agreement terminates.

    **d.**   **Manner of Use.** Retailer will (i) use only the Intellectual Property designated by K18 and only in the manner authorized and permitted by K18; (ii) use the Intellectual Property only in distributing, marketing, promoting, and selling Products pursuant to this Agreement and in connection with no other activities; and, (iii) display notices of trademark, service mark, and copyright ownership in the exact manner that K18 specifies.

    **e.**   **Prohibitions.** Retailer will not use the Intellectual Property or any part thereof: (i) in its corporate or legal name, assumed name, trade name, fictional business name, or other name or identity under which Retailer does business; (ii) with any prefix, suffix or other modifying words, terms, designs, colors or symbols; (iii) in any modified form; (iv) in connection with the sale of any unauthorized products or services; (v) in a domain name, URL, or social media handle; (vi) in any manner not expressly authorized in writing by K18; or (vii) in any manner that may result in K18's liability for Retailer's debts or obligations.

    **f.**   **No Confusion.** Retailer will not adopt, use or register any words, phrases or symbols which, in K18's sole judgment, are confusingly similar to any of the Intellectual Property.

    **g.**   **Changes.** K18 reserves the right to: (i) modify or discontinue licensing any of the Intellectual Property; and (ii) add new names, marks, designs, logos, trade dress, commercial symbols, or copyrights to the Intellectual Property and require that Retailer use them. Retailer will comply, at Retailer's sole expense, with K18's directions regarding changes in the Intellectual Property within the time period indicated in K18's written notice directing that the change be made. K18 will have no liability to Retailer for any cost, expense, loss or damage that Retailer incurs in complying with K18's directions and conforming to required changes.

    **h.**   **Breach; Infringement.** Retailer understands and agrees that any unauthorized use of the Intellectual Property by Retailer will constitute both a breach of this Agreement and an infringement of K18's, and K18's affiliates', intellectual property rights.

    **i.**   **Enforcement.** In order to enforce the provisions of this Section 28.i, K18 may exercise any and all remedies available to it under applicable law, including, without limitation, the right to specific performance, damages and injunctive relief.  Without limiting the foregoing, Retailer understands and agrees that K18 will be entitled to all remedies as may be awarded by a court of competent jurisdiction in the exercise of its powers.

    **j.**   **Survival.** The Parties agree that the provisions of this Agreement as set forth in this Section 28 will survive the termination or transfer of this Agreement.

**29. Confidential Information.**

    **a.**   **Definition.** "Confidential Information" means all information, data, materials and knowledge which may be disclosed to Retailer in confidence, or which Retailer may learn about, concerning Products, K18, K18's affiliates, or K18's customers, authorized distributors or authorized retailers, and which Retailer should reasonably understand to be confidential. Confidential Information includes, without limitation: (i) any information which concerns the formulae, ingredients, source of ingredients, recipes, specifications, manufacturing processes, or cost data for the manufacture

and production of Products; (ii) performance, safety, and market testing of Products; (iii) K18's business plans; (iv) wholesale or unpublished price lists of Products; (v) the sales, profit performance or other results of operations of K18, K18's affiliates, or K18's customers or authorized distributors or retailers, including financial results; (vi) results of customer and market surveys; (vii) knowledge of supply relationships; and, (viii) in general, knowledge about K18, K18's affiliates, K18's customers or other authorized distributors or retailers, whether now known or acquired or created in the future, and whether or not the information is in writing. Confidential Information does not include (a) information which Retailer can demonstrate came to its attention independent of its relationship with K18, without violating the confidentiality obligations of a third party, and (b) information that is, or has become, generally known in the public domain, except where public knowledge is the result of Retailer's wrongful disclosure, whether deliberate or inadvertent. Nothing in this Agreement obligates K18 to provide Retailer with Confidential Information or entitles Retailer to know or have access to Confidential Information.

a. **Limited Right to Use.** To the extent that K18 discloses, or Retailer acquires knowledge of, Confidential Information, Retailer agrees that it acquires no right, title or interest in the Confidential Information other than a limited, non-exclusive right to use the Confidential Information to discharge Retailer's obligations under this Agreement. Retailer understands and agrees that K18, and K18's affiliates, hold and retain full ownership of the Confidential Information and all goodwill therein.

b. **Breach; Unfair Competition.** Retailer's use, publication or duplication of any part of the Confidential Information for any purpose not authorized by this Agreement constitutes an unfair method of competition by Retailer and, additionally, a breach of this Agreement.

c. **Agreements.** Upon request by K18, Retailer will deliver to K18 a separate Confidentiality, Non-Disclosure and Non-Competition Agreement in the form required by K18, executed by Retailer and by each person who is now, or during the Term becomes, a member of the Executive Management of Retailer (i.e., every individual or entity who: (i) is a principal officer or member of the board of directors of Retailer if Retailer is a corporation; (ii) is a general partner of Retailer if Retailer is a general or limited partnership; (iii) is a manager of Retailer if Retailer is a limited liability company; (iv) occupies a similar status or performs similar functions, whether as an employee or independent contractor, as an individual identified in (i), (ii) and (iii); or (v) is a general manager of Retailer. Retailer represents that Exhibit F - Corporate Structure is a true and complete list of Retailer's Executive Management as of the Effective Date.

d. **Non-Disclosure.** Retailer agrees (i) not to disclose Confidential Information to any person or entity, except to those of its employees who require knowledge of the Confidential Information to enable Retailer to discharge its obligations under this Agreement; and (ii) to observe and implement the procedures prescribed from time to time by K18 to prevent the unauthorized or inadvertent use, publication or disclosure of Confidential Information including, without limitation, requiring that employees with access to Confidential Information, who are not otherwise required to sign a Confidentiality, Non-Disclosure and Non-Competition Agreement, execute K18's current form of Confidentiality, Non-Disclosure and Non-Competition

Agreement with Retailer. Upon request from K18, Retailer will deliver to K18 a copy of each executed Confidentiality, Non-Disclosure and Non-Competition Agreement for its records. Retailer will notify its employees to whom Retailer discloses Confidential Information of the confidential nature of Confidential Information and the requirements of this Agreement. Retailer will adopt policies and procedures intended to prevent the disclosure and distribution of Confidential Information except those permitted disclosures explicitly set forth in this Section 29. Retailer will employ policies and procedures reasonably calculated to preserve the confidentiality of the Confidential Information, and in this regard will, at a minimum, employ the policies and procedures put in place by Retailer to protect Retailer's confidential information.

e. **Breach of Agreements.** K18 may terminate this Agreement for cause if Retailer, or any person or entity required by this Agreement to execute a Confidentiality, Non-Disclosure and Non-Competition Agreement with K18 or Retailer, breaches the Confidentiality, Non-Disclosure and Non-Competition Agreement.

f. **Compelled Disclosure.** The provisions concerning non-disclosure of Confidential Information will not apply if disclosure of Confidential Information is legally compelled in a judicial or administrative proceeding, provided Retailer will have used its best efforts to avoid such disclosure, and will have afforded K18 the opportunity to obtain an appropriate protective order or other assurance satisfactory to K18 of confidential treatment for the information required to be disclosed.

g. **Enforcement.** In order to enforce the provisions of this Section 29, K18 may exercise any and all remedies available to it under applicable law, including, without limitation, the right to specific performance, damages and injunctive relief. Without limiting the foregoing, Retailer understands and agrees that K18 will be entitled to all remedies as may be awarded by a court of competent jurisdiction in the exercise of its powers.

h. **Survival.** The Parties agree that the provisions of this Agreement as set forth in this Section 29 will survive the termination or transfer of this Agreement.

30. **Termination With Cause.** K18 may terminate this Agreement, in its sole discretion and election, effective immediately upon K18's delivery of written notice of termination to Retailer based on any of the events set forth in this Section 30. If K18 terminates this Agreement pursuant to this Section 30, K18's written notice of termination will specify the event or events upon which K18 bases termination. Retailer will have no opportunity to cure a termination based on any of the events set forth in any sub-section of this Section 30.

a. If Retailer fails or refuses to pay any invoice on or before the date due, and should the default continue for a period of 15 days after written notice of default is given by K18 to Retailer.

b. If Retailer fails or refuses to submit any report or operating information in accordance with the requirements of this Agreement, and should the default continue for a period of 15 days after written notice of default is given by K18 to Retailer.

c. If Retailer loses the right for any period to occupy Retailer's Warehouse in France, leaving no facility in France at which Retailer receives, ships, and maintains inventory of Products.

d.  If Retailer violates the sales authorizations or sales limitations set forth in this Agreement.

e.  If Retailer is insolvent as that term is defined or construed under applicable law; or if all, or substantially all, of Retailer's assets or the retail rights granted by this Agreement are subject to an order of attachment, execution or other judicial seizure, unless the order or seizure is discharged within 30 days following issuance.

f.  If Retailer, or any of Retailer's Executive Management, is convicted of or pleads no contest to a criminal charge or engages in any conduct or practice that, in K18's judgment, reflects unfavorably upon or is detrimental or harmful to the good name, goodwill or reputation of K18, Products or the Intellectual Property.

g.  If Retailer engages in any material misrepresentation or fraudulent conduct in its dealings with retail end-user customers which, in K18's opinion, reflects unfavorably upon or is detrimental or harmful to the good name, goodwill or reputation of K18, Products or the Intellectual Property.

h.  If Retailer makes, or attempts to make, an unauthorized transfer in violation of this Agreement, if an order is made or resolution passed for the winding-up or the liquidation of Retailer (if Retailer is a corporation, limited liability company, partnership or other business entity), or if Retailer adopts or takes any action for its dissolution or liquidation.

i.  If Retailer receives, during the Term, one or more notices of default (whether or not the notices relate to the same or to different defaults and whether or not the defaults are timely cured by Retailer).

j.  If Retailer makes any unauthorized use, publication, duplication or disclosure of any part of the Confidential Information, or if any person required by this Agreement to execute a Confidentiality, Non-Disclosure and Non-Competition Agreement with K18 or Retailer breaches the Confidentiality, Non-Disclosure and Non-Competition Agreement.

k.  If Retailer makes any unauthorized use of any of the Intellectual Property.

l.  If Retailer commits any other act which, in K18's sole judgment, does, or can be expected to, materially impair the goodwill or reputation associated with K18, the Products, or any of the Intellectual Property.

m.  If Retailer otherwise breaches, or refuses to fulfill or perform, any of its other obligations under this Agreement which breach or refusal continues for 30 days after K18 gives Retailer written notice of default specifying the grounds of default and an opportunity to cure the default within the 30-day cure period.

n.  If K18 decides, in its sole discretion, to (i) discontinue distributing or selling Products in France; or (ii) sell, convey, merge or otherwise transfer all, or a substantial portion of the part(s) of its business that is/are responsible for distributing Products in France.

o.  If K18 decides to change the manner in which it distributes Products in France due to changes in applicable law or government enforcement or regulation after the Effective Date which, in K18's sole judgment, will adversely affect (i) claims that K18 may lawfully make about Products; (ii) the use of ingredients in Product formulae; (iii)

other legal requirements applicable to the offer or sale of Products in France; or (iv) K18's ability to produce, market, advertise, promote, distribute or sell Products in France competitively.

In any proceeding in which the validity of termination of this Agreement is at issue, K18 will not be limited to the reasons set forth in any notice of termination or default given to Retailer.

31. **Rights and Obligations on Termination.** Upon termination of this Agreement by either Party, the Parties will have the rights and obligations set forth in this Section 31.

   a. **Retailer's Sales.** On the effective date of termination, Retailer will immediately cease all sales of the Products. No later than the effective date of termination, Retailer will transfer to K18 or K18's designee all permits, licenses, approvals, and registrations that are necessary for the importation of the Products into France and the sale of Products within France.

   b. **Intellectual Property and Confidential Information.** No later than the effective date of termination, Retailer will immediately, and permanently, remove and cease using, in any manner whatsoever, the Intellectual Property and Confidential Information, and will refrain from doing any act which suggests or implies that Retailer is, or was, an authorized retailer/seller/reseller of Products. Retailer will cancel all advertising and promotional activities which associate Retailer with Products or K18. Continued use by Retailer of any of the Intellectual Property or Confidential Information will constitute willful infringement and unfair competition by Retailer.

   c. **Return of Property.** No later than the effective date of termination, Retailer will immediately deliver to K18, at Retailer's sole expense, and without compensation or reimbursement to Retailer, all written, electronic, or other materials constituting or containing any Confidential Information and Intellectual Property.

   d. **Product Advertising/In-Store Collateral.** No later than the effective date of termination, Retailer will immediately return to K18 all Product advertising, in-store collateral, and all copies thereof.

   e. **Product Shipments.** Immediately upon notice of termination, K18 will be relieved from any obligation to make any further shipments of Products and may cancel all of Retailer's unshipped orders of Products, irrespective of previous acceptance by K18. The sale or shipment of Products to Retailer or any other act after notice of termination of this Agreement will not constitute a waiver of the termination or any other rights of K18 under applicable law.

   f. **Product Repurchase.** At the option of K18, which will be exercised in the sole discretion of K18, K18 may repurchase from Retailer, at the invoice price paid by Retailer to K18 for the Products, Retailer's entire inventory of Products in saleable condition that has not been sold by Retailer before the effective date of termination; provided, however, that K18 may set-off from the purchase price any monies then due and owing by Retailer to K18 under this Agreement. Determination of which Products are in saleable condition will be made by K18, applying commercially reasonable standards. Retailer will immediately ready its inventory of unsold salable Products so that K18 may arrange to pick up all unsold salable Products at one location, which will be at Retailer's Warehouse. K18 will have 30 days after the effective date of termination of this Agreement in which to remove the inventory from

Retailer's Warehouse, during which time Retailer will continue to handle and store the inventory in accordance with K18's instructions at Retailer's expense. K18 will pay Retailer the purchase price for any inventory purchased by K18 promptly upon K18's determination of which Products are in saleable condition, but in any event, no later than 30 days after removal of the inventory from Retailer's Warehouse. Any Products not removed from Retailer's Warehouse will promptly be destroyed by Retailer at Retailer's sole expense. Retailer will confirm such destruction to K18 in writing.

g. **Obligations.** All obligations of Retailer which otherwise are not due will become immediately due and payable on the effective date of termination without presentment, demand, protest or notice of any kind, all of which are waived by Retailer. K18 may set-off from any sums which K18 may owe to Retailer the full amount then due and owing by Retailer to K18 under this Agreement.

h. **No Relief.** Neither Party, by reason of the termination of this Agreement, will be liable to the other for compensation or damages on account of present or prospective profits on sales or anticipated sales or on account of expenditures, investments or commitments made pursuant to this Agreement or in establishing, developing or maintaining the goodwill or reputation of K18, the Products, or the Intellectual Property. Except for the foregoing sentence, Section 33 regarding dispute resolution, and Sections 40 and 44 regarding punitive and consequential damages respectively, nothing in this Agreement will limit a Party's remedies, or right to recover all damages, under applicable law caused by the other Party's breach of this Agreement.

i. **Inspection.** All rights of inspection set forth in this Agreement will survive termination or Retailer's transfer of this Agreement.

32. **Transfers.**

a. **Restrictions.** Retailer understands and agrees that the rights granted to it are personal and are granted in reliance upon, among other considerations, the individual or collective character, skill, aptitude, attitude, experience, business ability and financial condition and capacity of Retailer and Retailer's Executive Management. Retailer will not, directly or indirectly, attempt or commit an Event of Transfer, or otherwise delegate its duties or obligations under this Agreement, either by operation of law or in any other manner, without K18's prior written consent, which may be withheld in its sole discretion. Retailer understands and agrees that K18 has the right to do business with persons of its own choosing and has complete discretion to approve any prospective transferee and to condition its approval upon the satisfaction of specific conditions. Retailer further understands and agrees that any actual, or attempted, Event of Transfer or other type of delegation of obligations or duties will be null and void and will constitute a material breach of this Agreement.

b. **Events of Transfer.** For purposes of this Agreement, each of the following is an "Event of Transfer":

i. The sale, assignment or transfer of all, or substantially all, of (i) the assets of Retailer; or (ii) Retailer's assets that are material to the Retailer's marketing, promotion, distribution, or sale of Products.

12

    ii.   The sale, assignment or transfer of Retailer's rights, or the delegation of Retailer's obligations or duties, under this Agreement to any person or entity.

    iii.   If Retailer is an individual, an order dissolving Retailer's marriage or Retailer's death or incapacity.

    iv.   Any change in Retailer's Executive Management, whether for cause, voluntary resignation, death, incapacity, or otherwise.

    v.   The sale, assignment, transfer, pledge, donation, encumbrance or other alienation of any interest in the equity or voting interests of Retailer for any reason, whether due to consolidation, merger, issuance of new equity or voting interests, or otherwise.

    vi.   A financial restructuring or recapitalization by Retailer secured by any, or all, of the equity or voting interests of Retailer or all or substantially all of the assets of Retailer's business.

    vii.   The transfer of any interest in this Agreement or in the equity or voting interests of Retailer to a trust of any kind.

    viii.   If Retailer is an individual, the transfer by Retailer of its right, title and interest under this Agreement to a business entity.

    ix.   The offer or sale of securities of Retailer or any Retailer affiliate pursuant to a transaction subject to registration under securities laws or by private placement pursuant to a written offering memorandum.

33. **Agreement to Arbitrate Disputes.**  Except as provided in Section 33.f.ii below, no Party will bring any claim or action arising out of the Parties' relationship, or this Agreement, or seeking enforcement of, or any other legal remedy founded on, this Agreement, except through the arbitration procedures described in this Section 33.

    a.   **Initiation of Action.** Either Party may initiate an arbitration proceeding by sending a written Request for Arbitration to the office of the JAMS arbitration service located in Los Angeles, California (the "Arbitration Service"), with a copy to the other Party. The Request for Arbitration will describe with specificity the nature of the dispute and claim for relief. Thereupon, both Parties will be obligated to engage in the arbitration, which will be conducted in accordance with the Arbitration Service's then current rules, except to the extent such rules conflict with this Agreement, in which case this Agreement will control.

    b.   **Single Arbitrator.** A single arbitrator, who must be a retired judge with no past or present affiliation or conflict with any Party to the arbitration, will conduct the arbitration. The Parties agree that the arbitrator and Arbitration Service's employees will be disqualified as a witness, expert, consultant or attorney in any pending or subsequent proceeding relating to the dispute which is the subject of the arbitration.

    c.   **Arbitrator Selection.** Upon receipt of the Request for Arbitration, the Arbitration Service will provide the Parties with a list of arbitrators willing to serve. The Parties will attempt in good faith to agree upon an arbitrator. If the Parties are unable to agree upon an arbitrator, and either Party so advises the Arbitration Service of that fact in writing no earlier than 10 days after receipt of the list, the Arbitration Service will appoint the arbitrator. The fees and expenses for the Arbitration Service, including

(without limitation) the arbitrator's fee, will be shared equally by the Parties. Each Party will bear its own attorney's fees and other costs incurred in connection with the arbitration irrespective of the outcome of the arbitration or the arbitrator's evaluation of each Party's case.

**d.**  **Start of Arbitration.** The arbitration proceeding will commence within 60 days after selection of the arbitrator. The arbitration will be conducted at the office of the Arbitration Service located in Los Angeles, California, unless K18, Retailer and the arbitrator agree upon a mutually acceptable alternative location.

**e.**  **Brief.** At least seven days before the first scheduled session of arbitration, each Party will deliver to the arbitrator and to the other Party a concise written summary of its position with respect to the matters in dispute and claim for relief, and other matters as required by the arbitrator.

**f.**  **Exception to Duty to Conduct Arbitration.**

    **i.**  **K18.** Notwithstanding the general language of Section 33, or any other provision of this Agreement (including, without limitation, any other provision of this Agreement relating to arbitration), K18 may bring suit in any court of competent jurisdiction to enjoin any actual or threatened violation of this Agreement pertaining to (i) the use of the Intellectual Property or Confidential Information; or (ii) any other act which is, or may be, detrimental or harmful to the reputation or goodwill of K18 or any of the Products.

    **ii.**  **Retailer.** Notwithstanding the general language of Section 33, or any other provision of this Agreement (including, without limitation, any other provision of this Agreement relating to arbitration), Retailer may bring suit in either the state or federal courts located in Los Angeles, California to enjoin any actual or threatened violation of this Agreement pertaining to the use of the Intellectual Property or Confidential Information.

**g.**  **Survival.** The Parties agree that this Section 33 will survive the termination or Retailer's transfer of this Agreement.

**34. Irreparable Injury.** Retailer understands and agrees that K18 will suffer irreparable injury not capable of precise measurement in money damages if Retailer, or any person on Retailer's behalf, commits any actual or threatened violation of this Agreement pertaining to (i) the use of the Intellectual Property or Confidential Information; or (ii) any other act which is, or may be, detrimental or harmful to the reputation or goodwill of K18 or any of the Products. Accordingly, in the event of any actual or threatened violation of the foregoing matters, Retailer, on behalf of itself and each of its owners, employees, agents, and affiliates, hereby consents to entry of a temporary restraining order or other injunctive relief as well as to any other equitable relief which may be granted by the court, without the requirement that K18 post bond. Retailer further agrees that the award of equitable remedies to K18 in the event of such actual or threatened violation of this Agreement is reasonable and necessary for the protection of the business and goodwill of K18. The Parties agree that this Section 34 will survive the termination or Retailer's transfer of this Agreement.

**35. Judicial Relief.** The Parties agree that all claims brought by Retailer in court will be brought in either the state or federal courts located in Los Angeles, California. Retailer hereby consents to personal jurisdiction before all such courts and agrees to accept service of

process in any litigation initiated in such courts regardless of Retailer's residence. The Parties agree that this Section 35 will survive the termination or Retailer's transfer of this Agreement.

36. **Reimbursement.** If either Party attempts to initiate litigation other than as provided in this Agreement, the other Party will be entitled to reimbursement of all fees, costs and expenses which it incurs, including, without limitation, fees to retain attorneys, accountants or other experts, to enforce its rights (i) to have the dispute or claim resolved by arbitration, (ii) to have the litigation transferred to the appropriate venue as provided in this Agreement, and/or (iii) to litigate the claims in the venue in which they were filed, as the case may be. The Parties agree that this Section 36 will survive the termination or Retailer's transfer of this Agreement.

37. **Transfer.** If either Party attempts to initiate litigation in a venue other than as provided in this Agreement, the other Party may seek to have the litigation transferred to the appropriate venue, and each Party hereby waives all rights under applicable law to oppose such a transfer, including, without limitation, based on the alleged inconvenience of any Party or witness. The Parties expressly agree to waive trial by jury in any such legal proceeding. The Parties agree that this Section 37 will survive the termination or Retailer's transfer of this Agreement.

38. **Choice of Law.** The Parties agree that California law will govern the construction, interpretation, validity and enforcement of this Agreement and will be applied in any arbitration or judicial proceeding to resolve all disputes between them, except that (i) California conflict of law principles will not be applied if the application of such principles would result in the law of a jurisdiction other than California governing the resolution of a dispute under this Agreement, and (ii) to the extent that the subject matter of the dispute arises exclusively under federal law, the federal laws of the United States will govern. The Parties agree that this Section 38 will survive the termination or Retailer's transfer of this Agreement.

39. **Limitation of Actions.** The Parties agree that no form of legal proceeding permitted under this Agreement may be maintained by either Party to enforce any liability or obligation of the other Party, whether arising from this Agreement or otherwise, unless the legal proceeding is initiated before the expiration of the earlier of (a) one year after the date of discovery of the facts resulting in the alleged liability or obligation or (b) two years after the date of the first act or omission giving rise to such alleged liability or obligation. The Parties agree that this Section 39 will survive the termination or Retailer's transfer of this Agreement.

40. **Punitive Damages.** The Parties, and their respective members of the board of directors, officers, shareholders and guarantors, as applicable, each hereby waive to the fullest extent permitted by law, any right to, or claim for, punitive or exemplary damages against the other and agree that, in the event of a dispute between them, each is limited to recovering only the actual damages proven to have been sustained by it. The Parties agree that this Section 40 will survive the termination or Retailer's transfer of this Agreement.

41. **Retailer's Covenants.** To induce K18 to enter into this Agreement, Retailer understands and agrees and represents to K18 each of the following.

    a. **Authority.** If Retailer is a business entity, Retailer represents that (i) it is duly organized and existing under the laws of the jurisdiction identified in Exhibit F - Corporate Structure; (ii) it is duly certified to do business in France; (iii) it has all necessary power and legal authority to enter into and perform its obligations under

this Agreement; and (iv) the person executing this Agreement on Retailer's behalf has the authority to bind Retailer to this Agreement and that authority has not been modified, limited or revoked.

**b.    No Reliance.** Retailer has not received or relied upon any promise or guaranty, express or implied, about the revenues, profits or success of the business venture contemplated by this Agreement.

**c.    No Misrepresentation.** All financial and other information about Retailer provided by Retailer to K18 is true and correct and no material information or fact has been omitted which is necessary in order to make the information disclosed to K18 not misleading.

**d.    Independent Investigation.** Retailer (i) has read this Agreement and understands its terms; (ii) has had full opportunity to investigate this transaction and to be advised and counseled by legal and other advisors of its own choice; (iii) understands that the transaction involves business risks and is dependent on Retailer's own business acumen and ability; and (iv) fully understands the binding effect of the provisions of this Agreement.

42. **Relationship of the Parties.** This Agreement does not create a fiduciary relationship or joint venture between the Parties, make Retailer a franchisee of K18, or make either Party a general or special agent, partner or employee of the other for any purpose. With respect to all matters, Retailer's relationship to K18 is as an independent contractor. As such, Retailer understands and agrees that it is in sole control of all aspects of its operation and will conduct its business using its own judgment and discretion, subject only to the provisions of this Agreement.  Retailer is not and will not be deemed to be K18's agent for any purpose and has no authority in K18's name or on its behalf to transact any business, incur any obligations, undertake any activities, or otherwise bind K18 in any manner.

43. **Indemnification.**

**a.    By Retailer.** Retailer will indemnify and hold K18, K18's affiliates and their respective officers, members of the board of directors, shareholders, members, managers, employees, agents, successors and assigns, harmless from and against any and all costs, expenses, losses, liabilities, damages, causes of action, claims and demands whatsoever that they, or any of them, may sustain or incur as a result of any act or omission of Retailer, its officers, members of the board of directors, shareholders, members, managers, employees or agents, or any activity at or in any Retailer Warehouse, including, without limitation, (i) Retailer's performance or breach of this Agreement; (ii) Retailer's negligence or other tortious conduct; (iii) Retailer's representations or statements about Products not specifically authorized by K18 in writing; (iv) claims brought by or against Retailer's personnel, employees, independent contractors or others who do business with Retailer; (v) any claims brought by any person or entity arising from Retailer's failure to comply with Section 26 regarding warranties; and (vi) Retailer's violations of applicable law.

Retailer's obligation to indemnify K18 will (i) apply to claims brought during and after the Term; (ii) for third party claims, apply to claims for actual, consequential and punitive damages of all kinds; (iii) cover K18's costs and expenses incurred in defending any third party claim covered by Retailer's indemnification, including, without limitation, attorneys and other professional fees, court costs, and travel and

living expenses; and (iv) not apply to Intellectual Property Claims (i.e., disputes with third parties involving K18's or K18's affiliates' ownership of, or rights in, the Intellectual Property or Confidential Information) which are within the scope of K18's limited indemnity set forth in Section 43.b.ii. K18 will have the right to retain its own counsel to defend any third-party claim asserted against K18 which is covered by Retailer's indemnification agreement.

**b.  By K18.** K18 will indemnify and hold Retailer, Retailer's affiliates and their respective officers, members of the board of directors, shareholders, members, managers, employees, agents, successors and assigns, harmless from and against any and all costs, expenses, losses, liabilities, damages, causes of action, claims and demands whatsoever that they, or any of them, may sustain or incur as a result of (i) claims arising under the continuing guarantee set forth in Exhibit E (Guaranty); and (ii) Intellectual Property Claims, subject to the requirement that Retailer has fully complied with its obligations in Sections 28 and/or 29 (Intellectual Property and Confidentiality), as the case may be, and as long as Intellectual Property Claims asserted or threatened against Retailer are not alleged or established to be based, directly or indirectly, upon Retailer's misuse of the Intellectual Property or Confidential Information, or other breach of this Agreement. For indemnification on Intellectual Property Claims, Retailer must promptly notify K18 immediately after first learning of the Intellectual Property Claim and must fully cooperate in the defense of the Intellectual Property Claim; further, because K18 will defend the Intellectual Property Claim, Retailer is not entitled to be reimbursed for legal or other professional fees or costs paid to independent legal counsel or others which Retailer elects to retain on its behalf in connection with the Intellectual Property Claim.

**44. No Consequential Damages.** EXCEPT IN THE CASE WHERE SUCH LIABILITY ARISES FROM A THIRD-PARTY CLAIM SUBJECT TO INDEMNIFICATION UNDER THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY TO THIS AGREEMENT BE LIABLE TO THE OTHER FOR LOST PROFITS, ANTICIPATED PROFITS, ECONOMIC LOSS, OR OTHER SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RESULTING FROM (i) ANY TERMINATION, CANCELLATION OR BREACH OF THIS AGREEMENT; OR (ii) ANY OTHER DISPUTE BETWEEN THE PARTIES TO THIS AGREEMENT.

**45. Notices.** All communications and reports required or permitted to be given to either Party hereunder will be in writing and will be deemed duly given on the earlier of (i) the date when delivered by hand; or (ii) the fourth business day after delivery to a reputable international courier service, provided that expedited delivery is requested by the Party sending the notice. All notices will be addressed to the Parties in accordance with Exhibit G, except that any Party may change its address for receiving notices by appropriate written notice to the other.

**46. Time of the Essence.** Time is of the essence of this Agreement with respect to each and every provision of this Agreement in which time is a factor.

**47. Rights and Remedies.** Except as specifically set forth in Sections 33 (arbitration), 40 (punitive damages) and 44 (consequential damages), all rights and remedies provided by this Agreement are in addition to, and not in lieu of, all other rights and remedies available to a Party under applicable law. Without limiting the immediately preceding sentence, Retailer understands and agrees that K18 will be entitled to all remedies as may be awarded by a court of competent jurisdiction including, without limitation, the right to specific performance, damages, injunctive relief and other extraordinary remedies.

48. **Withholding of Consent.** Unless this Agreement specifies otherwise, where this Agreement requires K18's approval or consent, or grants K18 discretion, K18 has the absolute right to refuse any request by Retailer or to withhold its approval of any action by Retailer, in the sole discretion of K18.

49. **Waiver.** Any waiver which K18 may grant to Retailer that excuses, modifies or reduces any obligation or restriction imposed under this Agreement will be in writing and will be effective upon delivery of the writing by K18 to Retailer or upon such other effective date as specified in the writing, and only to the extent specifically allowed in such writing. No waiver granted by K18, and no action taken by K18, with respect to any third party will limit K18's discretion to take action of any kind, or not to take action, with respect to Retailer. Any waiver granted by K18 to Retailer will be without prejudice to any other rights that K18 may have. No delay on the part of K18 in the exercise of any right or remedy will operate as a waiver thereof, and no single or partial exercise by K18 of any right or remedy will preclude K18 from fully exercising the right or remedy or any other right or remedy. K18's acceptance of any payments made by Retailer after a breach of this Agreement will not be, nor be construed as, a waiver by K18 of any breach by Retailer of any term, covenant or condition of this Agreement.

50. **Paragraph Headings; Language.** The paragraph headings used in this Agreement are inserted for convenience only and will not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions of this Agreement. The language used in this Agreement will in all cases be construed simply according to its fair meaning and not strictly for or against K18 or Retailer. The term "Retailer" as used herein is applicable to one or more persons, corporations, partnerships or entities, as the case may be, and the singular usage includes the plural and the masculine and neuter usage includes the other and the feminine. If two or more persons are at any time Retailer hereunder, whether or not as partners or joint venturers, their obligations and liabilities to K18 will be joint and several. Nothing in this Agreement is intended, nor will it be deemed, to confer any rights or remedies upon any person or entity not a Party hereto.

51. **Binding on Successors.** The covenants, agreements, terms and conditions contained in this Agreement will be binding upon, and will inure to the benefit of, the successors, assigns, heirs and personal representatives of the Parties hereto.

52. **Validity; Conformity With Applicable Law.** Wherever possible, each provision of this Agreement will be interpreted in such manner as to be valid under applicable law, but if any provision of this Agreement will be invalid or prohibited under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement. If any provision of this Agreement is deemed unenforceable by virtue of its scope in terms of geographic area, business activity prohibited or length of time, but could be enforceable by reducing any or all thereof, the Parties agree that the provision will be enforced to the fullest extent permissible under applicable law.

53. **Amendments.** No amendment, change, modification or variance to or from the terms and conditions set forth in this Agreement will be binding on any Party unless it is set forth in writing and executed: (i) on behalf of Retailer, by Retailer if Retailer is an individual, and, if not, by an authorized agent or officer of Retailer; and (ii) on behalf of K18, by a duly authorized officer of K18.

**54. Complete Agreement. The Parties agree that:**

    **a. Defined Agreement.** They each desire to have all terms of their business relationship defined in this written Agreement. Neither K18 nor Retailer wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different than or supplementary to the rights and obligations set forth herein. Accordingly, K18 and Retailer agree that this Agreement supersedes and cancels any prior or contemporaneous discussions that the Parties may have had, whether the prior discussions are described as presentations, inducements, promises, understandings or any other term. The foregoing applies to discussions between K18 or anyone acting on its behalf and Retailer or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the Parties. K18 and Retailer each agree that they have placed, and will place, no reliance on any such prior or contemporaneous discussions and will look exclusively to this Agreement for the terms of their relationship.

    **b. Incorporation.** Furthermore, K18 and Retailer agree that this Agreement, together with the addenda and exhibits attached hereto which the Parties hereby incorporate by reference, and any other document which the Parties reference in this Agreement and execute simultaneously with executing this Agreement, constitutes the entire agreement between the Parties concerning their relationship and contains all of the terms, conditions, rights and obligations with respect to their relationship. No prior or contemporaneous written contract, agreement or other writing in any format concerning their relationship will have any force or effect. No change, modification, amendment or waiver of any provision of this Agreement will be effective or binding upon either Party unless it is in writing, specifically identified as an amendment hereto.

    **c. Convention not applicable.** The parties agree that the United Nations Convention on Contracts for the International Sale of Goods, as developed in Vienna, Austria in 1980, or any successor or similar international convention or treaty, is not applicable to the Agreement.

**55. Covenant and Condition.** Each provision of this Agreement performable by Retailer will be construed to be both a covenant and a condition.

**56. Survival.** All provisions of this Agreement which expressly, or by their nature, require performance, or apply to a period, after the termination or transfer of this Agreement will indefinitely survive, and be enforceable, following termination or transfer of this Agreement.

**57. Further Assurances.** Each Party agrees to execute any additional documents or instruments that are reasonable or necessary to effectuate the purposes of this Agreement.

[signatures follow on next page]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives as of the Effective Date.

**K18, INC.**                                    **SAS CSP LOGISTICS**

_____    _____

By:  Suveen Sahib, CEO                    By: Marc Aublet, CEO, Groupe Provalliance,
                                                          as authorized agent, authorized signatory,
                                                          or attorney-in-fact on behalf of CSP SAS
                                                          Logistics

Email: suveens@k18hair.com            Email: marc.aublet@provalliance.fr

Date:_____        Date:_____

**EXHIBIT A — PRODUCTS**

| Product SKU | Product Description | Suggested Retail Price |
|---|---|---|
| K18-31007 | Molecular repair mask – 15ml | $29.00 USD |
| K18-31005 | Molecular repair mask – 50ml | $75.00 USD |
| K18-32012 | Molecular repair oil – 10ml | $27.00 USD |
| K18-32011 | Molecular repair oil – 30ml | $65.00 USD |
| K18-40035 | Detox Shampoo – 250ml | $38.00 USD |
| K18-40125 | Damage Shield Shampoo – 250ml | $36.00 USD |
| K18-40055 | Damage Shield Conditioner – 250ml | $36.00 USD |

**EXHIBIT B — ILLUSTRATIVE PRODUCT PRICING WITH TRADE DISCOUNT**

| Product SKU | Product Description | Retailer's Purchase Price |
|---|---|---|
| K18-31007 | Molecular repair mask – 15ml | $14.50 USD |
| K18-31005 | Molecular repair mask – 50ml | $37.50 USD |
| K18-32012 | Molecular repair oil – 10ml | $13.50 USD |
| K18-32011 | Molecular repair oil – 30ml | $32.50 USD |
| K18-40035 | Detox Shampoo – 250ml | $19.00 USD |
| K18-40125 | Damage Shield Shampoo – 250ml | $18.00 USD |
| K18-40055 | Damage Shield Conditioner – 250ml | $18.00 USD |

**EXHIBIT C — PURCHASE ORDERS**



| | 50ML Mask | 15ml Mask | Detox Shampoo 8.5 oz  Retail | Damage Shield Maintenance Shampoo 8.5 oz  Retail | Damage Shield Protective Conditioner 8.5 oz Retail | 30ml Hair Oil | 10ml Hair Oil |
|---|---|---|---|---|---|---|---|
| | K18-31005 108 per case | K18-31007 144 per case | K18-40035L 12 per case | K18-40125 12 per case | K18-40055 12 per case | K18-32011 72 per case | K18-32012 144 per case |
| Quantities | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Price Per Unit | $37.50 | $14.50 | $19.00 | $18.00 | $18.00 | $32.50 | $13.50 |
| Total Per Unit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |



NOTES:

# EXHIBIT D — MONTHLY REPORTS

Sell-through data:



Channel sell-through data:

| Channel - UNITS | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jan-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DTC/Online (UNITS) | | | | | | | | | | | | |
| Retail (UNITS) | | | | | | | | | | | | |
| Total | - | - | - | - | - | - | - | - | - | - | - | - |

| Channel - Sales $ | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DTC/Online (Sales in $) | | | | | | | | | | | | |
| Retail (Sales in $) | | | | | | | | | | | | |
| Total | | | | | | | | | | | | |

Currency For Sales Listed Above:

Inventory Data:

| SKU & Name | Jan-23 | Feb-23 | Mar-23 | Apr-23 | Jan-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K18-31007 - Leave-In Repair Mask 15ML /EU | | | | | | | | | | | | | | | | | | | | | | |
| K18-31005 - Leave-In Repair Mask 50ML/EU | | | | | | | | | | | | | | | | | | | | | | |
| K18-40035 - K18 Detox 8.5oz | | | | | | | | | | | | | | | | | | | | | | |
| K18-40125 - DamageShield pH Shampoo 8.5oz | | | | | | | | | | | | | | | | | | | | | | |
| K18-40055 - DamageShield Conditioner 8.5oz | | | | | | | | | | | | | | | | | | | | | | |
| K18-32012 - K18 10ml Elixir | | | | | | | | | | | | | | | | | | | | | | |
| K18-32011 - K18 30ml Elixir | | | | | | | | | | | | | | | | | | | | | | |

**By UNITS only not Value**

### EXHIBIT E — GUARANTY

K18 guarantees that each shipment or delivery of Products that K18 makes during the Term to, or on behalf of, Retailer will not, on the date that K18 delivers the shipment or delivery to the designated point of transfer, contain any article that does not comply with K18's specifications.  **EXCEPT FOR THE FOREGOING STATEMENT, COMPANY DISCLAIMS ALL OTHER, AND MAKES NO, EXPRESS OR IMPLIED WARRANTIES CONCERNING PRODUCT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.**

**EXHIBIT F — CORPORATE STRUCTURE**

Executive Management and Owners
(as of the Effective Date)

In the space provided in Part I, list the name and position held of each individual who is a member of Retailer's Executive Management; in Part II, complete the chart for Retailer and each Retailer affiliate; and in Part III, list the name and ownership interest of each individual who owns an interest in Retailer and each Retailer affiliate that is a corporation, partnership, limited liability company or other type of business entity.

Part I
Retailer's Executive Management

Retailer's Executive Management includes any individual who falls into the following categories:  (i) is a principal officer or member of the board of directors of Retailer if Retailer is a corporation; (ii) is a general partner of Retailer if Retailer is a general or limited partnership; (iii) is a manager of Retailer if Retailer is a limited liability company; (iv) occupies a similar status or performs similar functions, whether as an employee or independent contractor, as an individual described in (i), (ii) or (iii); or (v) is a General Manager. Print the names of the individuals in the appropriate space below.  Attach additional pages if needed.

(i)    Principal Officers (complete only if Retailer is a corporation):

Yohann Catherine

(ii)    Members of the Board of Directors (complete only if Retailer is a corporation):

(iii)    General Partners (complete only if Retailer is a general or limited partnership)

(iv)    Managers (complete only if Retailer is a limited liability company)

Yohann Catherine

_____

_____

(v)    Individuals who occupy a similar status or perform similar functions, whether as an employee or independent contractor, as an individual identified in (i), (ii), (iii) or (iv) (complete in all cases):

_____

_____

_____

(vi)    General Managers (complete in all cases)

Yohann Catherine (General Manager)

Antonin Landolfi

Thierry Gosselin

Vincent Marguet

Nicolas Barthélémy

Part II
Retailer and Retailer Affiliates
Identification, Address, and Authorized Securities
(Complete for Retailer and each Retailer affiliate)

| Name (use separate row for Retailer and each Retailer affiliate) | Jurisdiction of Organization or Incorporation (complete only for business entities) | Mailing Address (complete in all cases) | Authorized Securities (identify each class and total number of authorized securities per class) (complete only for corporations) |
|---|---|---|---|
| CSP | SAS | NC | |
| CSP Logistics | SAS | NC | |
| Bleu Libellule France | SAS | NC | |
| | | | |

(please attach additional pages as necessary)

28

Part III
Owners

If Retailer or any Retailer affiliate identified in Part II is a corporation, partnership, limited liability company or other type of business entity, print the name and address of every person or entity who is a legal or beneficial owner of any of the outstanding ownership interests as of the Effective Date. Attach additional pages if needed.

| Name | Mailing Address | Indicate Retailer or name of Retailer affiliate in which person or entity owns an ownership interest | Describe ownership interest. For corporations, specify number and class of securities; for all other entities, specify ownership interest and percentage owned of total outstanding ownership interests. |
|---|---|---|---|
| Leonardo Bidco | NC | CSP | President of CSP |
| CSP | NC | CSP Logistics Bleu Libellule France | President of CSP Logistics and Bleu Libellule France |
| | | | |
| | | | |

(please attach additional pages as necessary)

**EXHIBIT G — NOTICES**

**K18's address for notices:**

Mailing Address:    K18, INC.
                       Attn: LEGAL DEPARTMENT
                       621 Sansome Street
                       San Fransisco, California 94111
                       USA
                       Email: legal@k18hair.com

**Retailer's address for notices:**

Mailing Address:    Camille Laborie
                       Antonin Landolfi
                       CSP
                       1 Allée du Piot
                       Gallargues le Monteaux 30660
                       FRANCE
                       Emails: c.laborie@cspgroupe.com, a.landolfi@cspgroupe.com